UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald Anthony CAVALLINO,
Defendant-Appellant.

No. 73-3334.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1974.

Robert W. Rust, U. S. Atty., J. Daniel Ennis, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before DYER and MORGAN, Circuit Judges, and KRAFT, District Judge.

KRAFT, District Judge.

Appellant, Ronald Anthony Cavallino (Cavallino), was indicted with John Edward Ames (Ames) and David Anthony Washburn (Washburn) for conspiracy to rob a federally-insured bank and for robbery of that bank.[1] His pre-trial motion to suppress was granted in part and denied in part. His motion for severance was granted and he was tried alone to a jury, which found him guilty. Following the imposition of sentence he has appealed, alleging error both in the trial and in the partial denial of his motion to suppress.

Cavallino first contends that the trial court erred in refusing to suppress his incriminating statements as the fruit of a "sham" arrest. We disagree.

Louisiana officers, having Cavallino under surveillance as a suspect in bank robberies in that state, observed him load a substantial amount of clothing in a car in what appeared to be evident preparation to depart with a female companion. That observation was communicated to their superior, who, aware of Cavallino's propensity to violate motor vehicle laws, directed the officers to follow Cavallino and arrest him, if they saw him violate the law. The officers did follow and, when Cavallino substantially exceeded the speed limit, they stopped him. Upon his refusal to produce his driver's license, they arrested him for both offenses, misdemeanors under Louisiana law. In these circumstances the trial court found, upon ample evidence, that there was probable cause to arrest Cavallino for the two offenses.

Appellant argues that the motive for his arrest was not to prosecute him for these offenses, but rather to interrogate him about bank robberies and that the

Robert L. Moore, Asst. Federal Public Defender (court-appointed), J. V. Eskenazi, Federal Public Defender, Miami, Fla., for defendant-appellant.

1. 18 U.S.C. §§ 371, 2113(a), 2113(d), 2.

principle of Mills v. Wainwright, 5 Cir. 1969, 415 F.2d 787, should be extended to hold this to be a "sham" arrest.

■ As appellant concedes, the underlying arrest in *Mills, supra,* lacked any causal basis and was truly a sham employed by the police as an investigatory device. Where probable cause for the arrest exists, however, the motivation is immaterial.

> "Whether the arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it. . . ." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

This court said, of a similar contention in United States v. Seay, 5 Cir. 1970, 432 F.2d 395, 402:

> "Since the cause must be remanded, we deem it appropriate to comment on a contention raised in the briefs of the parties in this court. The *subjective* intention of the city police to use Seay's arrest only to hold him until federal officers could bring charges against him under the laws of the United States does not negate the *objective* validity of the arrest. If a police officer who makes a valid arrest thinks his jurisdiction will not ultimately continue with the processing of the arrest of a person, that thought on his part does not cause the arrest to then become illegal nor the charges to become pretextural or phony."

■ Appellant's second contention is that the trial court erred in refusing to suppress his incriminating statements relating to three Louisiana[2] bank robberies. He asserts that these were made in response to police interrogation after he had stated his desire to have a lawyer. Cavallino argues that once he expressed his desire to have a lawyer, a knowing and intelligent waiver of his *Miranda* rights was impossible, or, alternatively, that such a waiver could be found only if he expressly stated he no longer desired a lawyer.

We reject appellant's argument because the critical inquiry is whether the prosecution has sustained its heavy burden of establishing that Cavallino was fully informed of and understood his rights and whether, having once expressed his decision to exercise them, he later changed his mind and knowingly and understandingly declined to exercise them. Hill v. Whealon, 6 Cir. 1974, 490 F.2d 629; United States v. Anthony, 5 Cir. 1973, 474 F.2d 770; United States v. Collins, 2 Cir. 1972, 462 F.2d 792; United States v. Hopkins, 5 Cir. 1970, 433 F.2d 1041.

There can be no dispute that, as the trial court found, Cavallino was fully informed of his *Miranda* rights and fully understood them. Our review of the 427 page record of the proceedings on his motion to suppress reveals that he was first advised of his constitutional rights on the highway at the time of his arrest. He was again twice so advised at the police station, before any incriminating statement was made. Moreover, a sign posted in front of the detention cell block, in which he was temporarily confined, stated the same rights, as well as his right to use the telephone. There was testimony, too, to the effect that he had been "this route before" and knew "his rights", in apparent reference to his prior conviction and imprisonment for armed robbery, to which appellant testified.

The trial court found that, despite his earlier expressed wish to talk to an attorney, Cavallino later changed his mind and voluntarily, knowingly and understandingly forewent his right to consult with or have an attorney present and made the statements now challenged. Our review of the evidence indicates that it fully supports those findings.

About 6:30 P.M. on May 31, 1973, Sgt. Lyons had Cavallino brought from

---

2. The trial court suppressed appellant's incriminatory statements relating to the Florida bank robbery *sub judice,* finding that the officers had given him assurance that his statement about that robbery would not be used against him.

the detention cell to another room, advised him of his constitutional rights, which appellant said he understood, and then informed Cavallino that he wanted to talk to him about a certain local bank robbery. They conversed for twenty or thirty minutes, Sgt. Lyons recounting details to indicate to Cavallino that the police had a very knowledgeable informer and Cavallino stating that he knew nothing about any robbery. Finally Cavallino said he wanted to talk to an attorney, whereupon Sgt. Lyons immediately terminated the interview and Cavallino was returned to the "booking cage".

Cavallino's companion, a married woman with whom he lived, known as Miss Ketchim, had been brought to the police station at her request, because the car in which they were riding at the time of appellant's arrest was to be towed from the scene. She was not under arrest. Miss Ketchim asked to speak to appellant, who was again brought to a room to enable them to converse in privacy. Following that meeting of five to ten minutes Cavallino was returned to the "booking cage". Shortly thereafter, around 8:00 P.M., Cavallino sent a message to Sgt. Lyons that he wanted to speak with him. In the interval of about an hour following Sgt. Lyons termination of the earlier interview, Cavallino made no request to use the telephone.

Upon receipt of Cavallino's message Sgt. Lyons went to the "booking cage" and asked Cavallino what he wanted. He did not repeat the *Miranda* rights. Cavallino wanted to know what kind of a deal he could make, "if" he had done something and "if" he told about it. Sgt. Lyons told him he could make no deal. This conversation, interspersed with periods of silence, went on for nearly an hour, with Cavallino probing for possibilities of some deal on an "if" basis and Sgt. Lyons indicating his inability to make any deal and interjecting more details of the robbery to indicate to Cavallino the extent of the police informer's apparent knowledge. Cavallino made no

incriminatory statements. Sgt. Lyons finally terminated the conversation, telling Cavallino that he was wasting Lyons' time, and walked away.

About half an hour later Miss Ketchim again asked to talk to Cavallino. The two were permitted to converse privately in a room for nearly ten minutes. At the conclusion of their conversation, about 10 P.M., Cavallino accosted Sgt. Lyons, who was nearby, and asked why Miss Ketchim was being held. Sgt. Lyons told him she was not under arrest and was not being held. Cavallino, who still had not availed himself of the right to use the telephone, told Sgt. Lyons that if Miss Ketchim was released he would tell them what they wanted to know.

Cavallino was then taken to another room. His constitutional rights were again read to him. With full knowledge and understanding of his rights he, nonetheless, told Sgt. Lyons and another officer that he had "pulled the job" in question with Washburn and Ames. He was placed under arrest on a warrant, which had arrived meanwhile, booked for robbery and transferred to the Detective Bureau at another police station. There, he was again read his constitutional rights, after which he orally recounted, with some hilarity, the details of three Louisiana bank robberies in which he had participated. Later, he signed written confessions to these robberies and a written waiver of his constitutional rights.

■ The trial court concluded that, after Cavallino first expressed his wish to see an attorney, he determined to and did engage in a course calculated to ascertain how much the police already knew and whether there were any prospects of some deal and whether, if he talked, he could limit the consequences of his admissions to the Louisiana crimes; that, having learned sufficient to decide what course he would pursue, he changed his mind about wanting to talk to an attorney and initiated the conversation embracing his incriminatory statements, which did not result from

police interrogation. Waiver by a defendant of his constitutional right to consult with or to have an attorney present does not require an express statement or disavowal. Waiver may be inferred from the language, acts, conduct and demeanor of a defendant.

Appellant's next contention is that the trial court erred in admitting evidence of numerous substantial cash payments made by Cavallino shortly after the Florida bank robbery, without first establishing a foundation of appellant's prior impecuniosity.

This court said, in Self v. United States, 5 Cir. 1957, 249 F.2d 32, 34, 35:

"It is evident, also, that appellant misconceives the rule sometimes applied to reject evidence of possession of money after the commission of a crime without showing destitute circumstances of the party prior to the crime. *The authorities cited do not tend to establish the rule as one of general or inflexible application.* The most that can be said of it is that proof of the unexplained possession of unusual amounts of money after a robbery, *standing alone,* is not competent evidence to connect the possessor with the robbery; but it becomes competent provided it is further shown that he was impecunious prior thereto." (emphasis supplied)

■ The vice of appellant's argument is that he construes this, and similar language in other cases, to mean that *only* evidence of prior impecuniosity renders evidence of such possession admissible. To the contrary, while evidence of prior impecuniosity will render evidence of such possession admissible, it does not follow that other relevant evidence will not effect the same result.

We examine first the unchallenged details of the Florida robbery. About 10:30 A.M., May 2, 1973 the Barnett Bank at Midway, Miami, was robbed by two armed men, at least one of whom was white. Both robbers, who entered the rear door, wore jumpsuits, gloves and motorcycle helmets with dark-colored facial visors. The taller robber appeared to have a nylon stocking over his head and face beneath the helmet and carried a revolver. The other, who appeared "bulky" or "very chunky" had a sawed-off shotgun. Their disguises successfully precluded later identification. They had a pale green duffel bag, from which was removed a blue denim bag and a white sack. The latter was used to deposit money from the tellers' drawers and the former for currency taken in the vault. While the taller robber was in the vault, his companion began aloud a "time count-down", one of them having earlier stated they had only ten minutes to be out of the bank. After putting the bank's personnel and customers in fear and taking the money from both tellers' cage and the vault, the robbers left by the rear door and departed in a 1966 Pontiac car, license 10–52744, which was found later that day in the nearby Midway Mall shopping center. The vehicle had been stolen near that Mall on the previous night about 8 P.M. The bills taken from the vault included "bait" money, susceptible of later identification.

We next examine the trial record to determine whether other circumstances appear, which support the conclusion of the court below that the circumstance of Cavallino's post-robbery affluence did not stand alone in pointing to a connection between Cavallino and the robbery.

The prosecution offered to prove that appellant had no employment or earnings for the six years preceding May, 1972, by showing he had been in prison continuously for that period. The trial court sustained appellant's objection to the offer, and, so, we do not consider it.

We do consider the evidence that:

Cavallino, with Ames and Washburn, robbed a Louisiana bank on February 9, 1973. On February 27, 1973 Cavallino, with Ames, robbed another Louisiana bank. Again, with Ames and Washburn, Cavallino robbed a third Louisiana bank on March 20, 1973.

Ames moved to Ormond Beach, Florida, with Janice Stinson and leased an apartment there on April 15, 1973. Four days later Washburn, with his wife and child, arrived and leased an apartment. Shortly thereafter, Cavallino rented a Chevrolet automobile at an airport rental agency in Jacksonville, Florida and drove to Ormond Beach. Around April 22, Washburn and Cavallino twice visited Ames' apartment. Cavallino, during this period, also visited Washburn's apartment, while Ames was there. Ames, Washburn and Cavallino were together twice in a car, during this period, conversing for periods of one to three hours. Neither Ames, Washburn nor Cavallino was then employed nor were they receiving money from other sources.

On May 1, between 7 and 7:30 A.M., Cavallino came to Ames' apartment in his rented Chevrolet and Washburn arrived in a Cadillac. Ames got into Cavallino's car and both cars drove away. At 8 P.M. that night the Pontiac used by the bank robbers was stolen. The following morning, May 2, the bank robbery occurred. That evening, about 8 P.M. Ames, Washburn and Cavallino returned to Ames' apartment. Washburn carried a very large bag full of "something". All three entered the bedroom and remained there about 45 minutes with the door closed. Cavallino then left the bedroom with a medium size suitcase. He returned, shortly, with the same suitcase. Soon thereafter all three came from the bedroom and ate dinner. After dinner Cavallino and Washburn left the apartment, one carrying the suitcase.

The next day, May 3, Janice Stinson saw two motorcycle helmets and two life jackets in the bedroom closet of Ames' apartment, where she lived with Ames. She had never seen them before. She also saw a green bag on the dining room floor. Later that day she went with Ames to Tamoca State Park, where Ames threw the motorcycle helmets, and some jumpsuits and bags into the lake. On May 24, in Janice Stinson's presence, police recovered a blue-green jumpsuit from the lake and, on May 25, they recovered a sawed-off shotgun, a blue denim bag and a white drawstring bag. These were among the articles thrown in the lake by Ames on May 3. The jumpsuit, the blue denim bag, the white bag and the sawed-off shotgun were similar to or identical to like items used by the robbers.

On May 4, while assisting Ames to pack, Janice Stinson saw a large amount of money in his suitcase. Ames left his Ormond Beach apartment on May 4 and was arrested in Massachusetts for motor vehicle violations on May 6. Found in Ames' possession at the time of his arrest was $27,420 in currency and 101 motor vehicle master keys. The currency, which was approximately one third of the amount stolen in the Florida bank robbery, included 37 bills taken in that robbery. One of the master keys fit the stolen Pontiac used in the robbers' flight.

On May 17, the police, searching the Ormond Beach apartment vacated by Ames, found a green bag, a nylon stocking and two life preservers. Janice Stinson testified the nylon stocking was not hers.

On May 5, the day before Ames' arrest in Massachusetts, Cavallino was in Palm Springs, California, where he purchased a Pontiac automobile for which, with appurtenant charges, he paid in excess of $3,700, in cash, in bills of various denominations. He represented himself to be the owner of an electronics firm. On May 6, Washburn bought a Lincoln automobile in Palm Springs, California for $5,825, paying $500, in cash, that day and the balance, in cash, the next morning.

Cavallino next appeared in Metairie, Louisiana on May 10. He made successive purchases of jewelry, for cash on May 10—$750, May 11—$106.10, May 14 —$1,155.

On May 15 Cavallino appeared in Mobile, Alabama where he traded in a Pontiac car for another, paying the differ-

ence of $2,350 in cash. He directed that title be put in the name of R. H. Johnson, which he indicated, was the name of the woman who accompanied him. He was in Mobile for several days and made a $500 cash deposit on the purchase of a $42,500 home, which, he indicated, was to be bought in the name of Johnson. The transaction was never concluded.

On May 19, Cavallino was again in Metairie, Louisiana and bought a motorcycle for $610 in cash. Three days later he traded it in on another motorcycle and paid the difference of $132 in cash. Soon thereafter he made another such trade-in, again paying the difference of $172 in cash.

■ From the foregoing it is apparent that the evidence of Cavallino's post-robbery affluence did not stand alone, but was supported by a number of other circumstances, which justified its admission, and the question thus became one of weight and not of admissibility. United States v. Falley, 2 Cir. 1973, 489 F.2d 33.

Appellant's final contention is that the trial court erred in admitting evidence of his commission of the Louisiana robberies on the issues of (a) an intent to conspire to commit the instant offense and (b) identity as a participant in the instant robbery. Appellant argues that the evidence of similarity in the *modus operandi* was insufficient to be probative of identity or intent to conspire and, alternatively, that if it was relevant and probative, the probative did not outweigh the possibility of prejudice to appellant. We disagree.

■ As this court pointed out, in United States v. Goodwin, 5 Cir. 1974, 492 F.2d 1141 (decided April 19, 1974) and the cases therein cited,[3] there are exceptions to the general rule that evidence of the commission of independent crimes is not admissible against a defendant on trial. Among the well-recog-

nized exceptions are those which permit evidence of other crimes to show identity or intent. However, our cases also teach that before these exceptions are available to the prosecution several threshold inquiries must be made and resolved by the trial court.

Is there plain, clear and convincing proof of the commission of the other similar offenses by the accused?

Here there was. There was no dispute that three Louisiana banks were robbed. The appellant's voluntary confession established his participation in these robberies in detail.

How recent are the other crimes, in relation to the one now charged?

The other crimes were in February and March, 1973, the one here charged on May 2, 1973.

Are Cavallino's "identity" as one of the Florida robbers and his "intent to conspire" material facts in issue?

Both were in issue.

Has the prosecution actual need for such probative evidence?

In the case *sub judice* the prosecution's need was critical. No witnesses could identify the Florida robbers nor could bank camera pictures enable identification, because of disguises so complete and misleading that the white color of one robber was perceived only by accident. No fingerprints were available, because the robbers wore gloves. Cavallino's confession to this robbery was excluded by the trial court, because of police assurances that that confession would not be used against him. In short, no other evidence was available.

Considering the prosecution's actual need on these contested issues and its lack of any other evidence, does the probative value of the proposed evidence outweigh its inherent prejudicial effect?

In this case it did. Absent the proffered evidence the prosecution's case

---

3. United States v. Lawrance, 5 Cir. 1973, 480 F.2d 688; United States v. Broadway, 5 Cir. 1973, 477 F.2d 991; United States v. Boyd, 5 Cir. 1971, 446 F.2d 1267; Hamilton v. United States, 5 Cir. 1969, 409 F.2d 928.

must fail, while, conversely, with the proffered evidence conviction was far from inevitable.

The threshold questions resolved, we consider, next, whether the proffered evidence fit the exceptions.

■ The "identity" exception was here employed to show similar *"modus operandi"*. In such circumstances a general similarity affords no key to the evidential gate. There must be sufficient similarity between the *"modus operandi"* in the former crimes and that in the crime charged to permit a jury reasonably to conclude from the former that the latter is the handiwork of the accused. The trial court, with commendable caution, limited, perhaps too severely, the elements of similarity which the prosecution was permitted to show.

The following similarities are disclosed by the evidence: Each robbery victim was a bank. The first robbery was committed, February 9, by Cavallino, Ames and Washburn; the second, February 27, by Cavallino and Ames; the third, March 20, by Cavallino, Ames and Washburn. The evidence that Ames left Ormond Beach two days after the Florida robbery, having meanwhile thrown into a lake the items heretofore mentioned, and was arrested in Massachusetts four days after the robbery with more than $27,000 in cash, including 37 identifiable bills taken in the robbery, and more than 100 automobile master keys, one of which fit the stolen Pontiac, points to Ames as one of the robbers. The evidence also indicates that there were two or, possibly, three involved, if one remained with a "cool" getaway car.

Before each of the former robberies the participants had a meeting. Before the Florida robbery Cavallino, Ames and Washburn had several meetings and were absent from their abodes, and apparently together, from about 7:30 A.M. the day before the Florida robbery until after their return to Ames' apartment about ten hours after the robbery.

A stolen or "hot" car of General Motors manufacture was used to approach and to leave the bank in all instances. A rented or "cool" car (or cars), obtained at an airport rental agency, was used after the "hot" car was abandoned in each of the former crimes. In the Florida robbery the "hot" car was soon abandoned. Cavallino, accompanied by Ames, had left Ames' apartment in his airport rental car the day before the robbery and returned there about 8:30 P.M. on the day of the Florida robbery.

In all four crimes, the "hot" car was parked at the bank's rear door and the robbers entered and departed by the rear door. All four robberies were committed between 9 A.M. and 11:30 A.M. In all four crimes one of the robbers was armed with a revolver and in the last Louisiana robbery and the Florida robbery another robber was armed with a sawed-off shotgun. Each of the four robberies was quick and apparently timed with precision.

Additionally, appellant's confession of the Louisiana robberies stated the view that morning, between nine and eleven was the best time to rob banks and that "cool" cars were best rented at airport agencies.

■ We conclude that the elements of similarity admitted into evidence were more than a general similarity and were sufficient to permit the jury to determine whether the Florida robbery was, in part, the handiwork of Cavallino. Again, the question became one of weight, not of admissibility.

■ It was self-evident that those who robbed the Florida bank had conspired to do so. Since the evidence of other similar crimes was here admissible to establish the identity of Cavallino as a participant in the Florida robbery, it was likewise admissible to show an "intent to conspire" to commit that robbery.

The judgments are affirmed.