**UNITED STATES of America**

v.

**Mackey Raymond CHOICE et al.**

**Crim. No. 74–664.**

United States District Court,
E. D. Pennsylvania.

April 25, 1975.

Frank J. Bove, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Robert A. Stein, Philadelphia, Pa., for defendants.

## MEMORANDUM

FOGEL, District Judge.

Mackey Raymond Choice was indicted for bank robbery, conspiracy and unlawfully carrying a firearm during the commission of a felony, as a result of an incident which occurred at the Provident National Bank branch located at 3901 Conshohocken Avenue, Philadelphia, on October 16, 1974. Choice filed several pretrial motions, including a motion to suppress statements which were averred to have been made to agents of the Federal Bureau of Investigation (The Bureau). On January 20, 1975, we held evidentiary hearings on these motions, and on similar motions filed by Harry Glover, a co-defendant. On February 4, 1975, we denied each of the motions, and delivered oral findings of fact and conclusions of law in open court. The findings of fact and conclusions of law with respect to Choice's suppression motion can be found at pages 15–23 of the Notes of Testimony.

Choice was thereafter tried before a jury and was found guilty on February 26, 1975, on those counts charging him with bank robbery and conspiracy, a judgment of acquittal having been entered by us prior to submission of the matter to the jury on the count relating to the unlawful carrying of a firearm.

Imposition of sentence has been scheduled. At this juncture, however, we will further discuss the reasons for our ruling denying Choice's motion to suppress certain evidence which was subsequently admitted during the course of the trial.[1]

Our previous findings of fact may be summarized as follows: On October 16, 1974, Choice was treated for gunshot wounds at the emergency room of Osteopathic Hospital in Philadelphia. According to the stipulation of the parties:[2]

* * * As soon as Mr. Choice was admitted into the emergency room of Osteopathic Hospital, an intravenous solution procedure was started. A tube was placed in Mr. Choice's vein at the crook of the right arm, near the bend in the elbow. A 1000 c.c. lactated ringer solution was administered. This is a mixture of water and sodium and is used to expand the blood volume to prohibit shock. This procedure began at approximately 1:00 when Mr. Choice was first admitted.

A Foley [catheter] was inserted into Mr. Choice's penis. A Foley [catheter] is a soft, latex tube with a balloon-type mechanism on the end. Once inserted into the penis, the balloon is blown up. The [catheter] monitors the rate of urinary flow

1. We also denied a motion to suppress statements allegedly made to Officer Ennis Mitchell of the Philadelphia Police Department. At trial, however, the government did not seek to introduce this statement into evidence. In the course of the present discussion we shall consider the circumstances of the interview conducted by Officer Mitchell in connection with the admissibility of statements allegedly made to Agent King of The Bureau, and the effect of that episode in establishing (as per the findings of fact and conclusions of law previously entered, as well as the reasons set forth in this memorandum), that defendant fully comprehended his rights when interviewed by The Bureau Agents, and consciously and voluntarily decided to make a statement, which conduct was consistent with his actions previously that same afternoon, when he made the statement he did to Officer Mitchell.

2. Marked as Choice's Exhibit No. 1 at the hearing on January 20, 1975.

which tells whether or not an individual is going into shock. It is also used to see if there is blood in the urine which would be an indication of internal damage, or damage to the liver.

A physical examination was then conducted. It was determined that there was a gunshot wound behind the right thigh and there was another gunshot wound near the right foot on the right side. Mr. Choice's pulses were good and there was no neurologic loss. There was a hematoma on the right thigh which is a bruise and discoloration. Mr. Choice seemed alert and in stable condition. There were numerous uniformed police officers present as well as several detectives from the Philadelphia Police. In addition, many students from the hospital were in the emergency room as well as two police doctors. * * *

A blood sample of Mr. Choice was taken and received in the laboratory on October 16, 1974, at approximately 1:43 P.M. Blood tests indicate that there was nothing unusual about Mr. Choice's blood content. However, a routine urinalysis indicated that there was an abnormal amount of protein in the urine as indicated by a +2 [albumin] test. Moreover, there were traces of acetone in the urine as well as traces of bilirubin. Moreover, there were traces of uroliduogen. This indicates there was an abnormal urinalysis and there was probably something wrong with Mr. Choice's liver which could have left him in pain.

Mr. Choice was later x-rayed and it was found that there was a fracture of the left inferior pelvicrami, which is the bridge of bone in front of the penis. There was a commuted fracture of the right anterior and post-anterior thigh. There were metallic bullets within the range of the left buttock, the right mid-thigh, and the right distal leg.

Dr. James Harris treated Choice at Osteopathic Hospital. While Dr. Harris thinks that Choice may have requested an attorney at that time, he admits that he is only "about fifteen percent certain" that Choice did request an attorney, and further admits that he was busily engaged in the emergency room on that day and would not now recognize Choice if he saw him.[3]

Before Choice left Osteopathic Hospital, bandages were applied to his wound and a splint to his right leg. He was taken from Osteopathic Hospital to the Emergency Room of Philadelphia General Hospital (PGH), where he received the following treatment. Again, we quote the stipulation of the parties:[4]

* * * Mr. Choice had sustained a gunshot wound to the right thigh and right ankle and there was a bullet tracted on the right thigh to the right femoral head but no fracture. There was another bullet tracted through to the left ramus of the pubis and a compound fracture of the left gluteal area laterally. The right ankle was shattered and there was a fracture of the tibia. There was a gross hematoma of the right leg and there was a Foley [catheter] in the patient's penis. His right leg was also in a splint. There was a massive swelling of the right thigh as a result of the wound. During the emergency examination, and while preliminary diagnosis was being obtained, Dr. O'Yek [the treating physician] observed that the patient, Mr. Choice, was in moderate pain as indicated by his visual observations of the patient's reactions to movement and to the treatment. The intravenous solution that had been applied at Osteopathic Hospital was maintained and Mr. Choice's temperature was found to be 101°. The exterior of the wounds were treated in the emergency

---

3. See Choice's Exhibit #2 to the suppression hearing on January 20, 1975.

4. See Choice's Exhibit #1 to the suppression hearing on January 20, 1975.

ward and Mr. Choice was given several forms of antibiotics. * * *

On the afternoon of October 16, 1974, Special Agent Robert Legg of The Bureau went to the emergency room at PGH for the purpose of interviewing Choice as a suspect in the bank robbery which had occurred earlier that day at the Provident National Bank. Agent Legg went up to Choice, identified himself as a special agent, and asked Choice if he would like to make a statement. Prior to doing so, he had not personally discussed Choice's condition with the medical staff at PGH. At this confrontation, Choice did not explicitly refuse to make a statement, but merely remained silent, and did not acknowledge the presence of Agent Legg at all. Agent Legg did not advise Choice of his rights at that time due to defendant's absolute silence throughout the encounter. (N.T. 8–16, January 20, 1975).

Thereafter, Choice was transferred from the emergency room to the Intensive Care Unit of the Surgical Division of PGH, where an arteriogram was performed.

* * * An arteriogram is a test whereby a large needle filled with dye is inserted into one of the patient's major arteries. A dye-type solution is injected and an xray is then taken of the patient to see if any bullet passed through any artery. Normally, this test causes heat to the patient. This heat sensation can be painful as there is a definite burning sensation. The arteriogram was done at approximately 6:00 in the evening.

* * * * * *

Dr. A. Saragovi, M.D., * * * administered the arteriogram that is mentioned above to Mr. Choice. The procedure for this examination was to place Mr. Choice under local Xylocaine anesthesia in the right groin, and then place an 18 gauge Seldinger needle in the common femoral artery using the Seldinger technique and a guide wire followed by a polyethylene catheter advanced to the lower abdominal aorta. This procedure was done in the xray department and it was concluded that there was no evidence of arterial injuries or bleeding. However, there is a suggestion of minimal spasm at the take-off of the left profunda femoral artery.[5]

The arteriogram established that there was no indication of arterial damage, and Choice was removed from the surgical ward to the orthopedic ward of PGH, where a cast was placed on his lower right leg.

The x-rays taken at the time of Choice's admission to PGH revealed a bullet lodged in the region of the gluteal muscle between the anterior-inferior iliac spine in the greater trochanter. The soft tissue density in this area implied a hematoma. There was a missile tract leading medially, which also contained bone fragments. Further, there was a cortical fracture of the inferior pubic ramus.

Shortly after Choice's admission, the drug keflin, an antiobiotic, and a tetanus toxoid shot were administered.

The parties also have stipulated that by midnight of October 16, 1974, "all emergency care and diagnostic treatment were complete and Mr. Choice was resting in the Orthopedic Ward surrounded by a police escort."[6]

At approximately 1:00 P.M. on October 17, 1974, Officer Ennis Mitchell of the Homicide Division, Philadelphia Police Department, went to PGH for the purpose of interviewing Choice in connection with the robbery at the Provident National Bank the previous day. Prior to interviewing Choice, Mitchell did not personally inquire about Choice's condition from physicians on the hospital staff, but he did ask a nurse whether Choice was awake and whether he could talk, and received affirmative answers to both questions. Choice was in a ward on the fourth floor of Building #17 at

5. Stipulation, Choice's Exhibit #1 at the hearing on January 20, 1975.

6. Stipulation, Choice's Exhibit #1 at the hearing on January 20, 1975.

PGH, guarded by two police officers. One of his arms was in a sling, and there may have been an intravenous device, but there were not tubes in his nose or mouth. When Mitchell approached the bed, Choice's eyes were open and he appeared to be awake. Mitchell immediately informed Choice that he wished to question him concerning the robbery of the Provident National Bank, and advised him of his rights according to a standard Philadelphia Police form:

"We are questioning you concerning the hold up of Provident Bank at 3901 Conshohocken Avenue on 10/16/74 at approximately 12:50 p. m.

"You have a right to remain silent and do not have to say anything at all. "Anything you say can and will be used against you in court.

"You have a right to talk to a lawyer of your own choice before we ask you any questions; also to have a lawyer here with you while we ask questions.

"If you are willing to give us a statement you have a right to stop any time you wish.

"Do you understand that you have a right to keep quiet and do not have to say anything at all?"

And his response was "Yes."

"Do you understand that anything you say can and will be used against you"

Again his response was "Yes."

"Do you want to remain silent?"

"No."

"Do you understand that you have a right to talk with a lawyer before we ask you any questions?"

His answer was "Yes".

"Do you understand if you cannot afford to hire a lawyer and you want one we will not ask you any questions until a lawyer is appointed for you free of charge?"

His answer was "Yes."

"Do you want either to talk with a lawyer at this time or to have a law-yer with you while we ask you questions?" His answer was "No."

"Are you willing to answer questions of your own free will without force or fear and without any threats or promises having been made to you?" His answer was "Yes."

(N.T. 19–20, January 20, 1975).

During the course of the next two hours, Mitchell interviewed Choice about his participation in the bank robbery, and also discussed other matters not included in the notes produced at the pretrial hearing. Choice answered some questions and did not respond to others. It was never necessary to rouse Choice at any time during the interview in order to get his attention. Mitchell asked Choice to sign the notes taken at the interview, but he refused to do so.

The Bureau agents, R. Douglas King and Dennis Sackreiter went to PGH later that afternoon, at approximately 3:00 P.M., or shortly thereafter, and requested permission from the head nurse to interview Choice. The nurse spoke to a physician by telephone, and permission was granted. The agents did not, however, make specific inquiries with respect to Choice's physical condition. They located Choice in the orthopedic ward, informed him that they wished to speak to him concerning the robbery of the Provident National Bank the previous day, and furnished him with The Bureau advice of rights form. Choice looked at the form, keeping it in his possession for two or three minutes, and stated that he knew what it was and understood it; however, he refused to sign the form. From 3:23 P.M. until 3:46 P.M. the agents questioned Choice, and showed him a bank surveillance photograph. At one point, Choice stated that he did not wish to say anything further without the advice of counsel, and the interview there and then terminated.[7]

Within this factual framework, we shall discuss the legal issues pertinent to Choice's motion to suppress the statement made to Agents King and Sackreiter of The Bureau. This motion is

7. Exhibit G–3 at the hearing on January 20, 1975.

grounded upon the assertion that Choice did not knowingly and intelligently waive his Fifth and Sixth Amendment rights prior to being interviewed at the orthopedic ward of PGH, and, further, that any statement given under such circumstances cannot be considered voluntary under the applicable legal standards.

In Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), the Supreme Court held that, in the context of custodial interrogation,

> "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against selfincrimination and his right to retained or appointed counsel."

While the Court has set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), it is now settled that a confession which is challenged on constitutional grounds, including lack of voluntariness, is admissible if the Court is satisfied by a preponderance of the evidence that the legal requirements for admission have been met; it is not necessary to establish admissibility beyond a reasonable doubt, Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

The procedure to be followed by the trial court is aptly delineated in Pettyjohn v. United States, 136 U.S.App.D.C. 69, 419 F.2d 651, 654, n. 7 (1969), cert.

den. 397 U.S. 1058, 90 S.Ct. 1383, 25 L. Ed.2d 676:

> \* \* \* the validity of any *Miranda* waiver must be determined by the court's inspection of the particular circumstances involved, including the education, experience and conduct of the accused as well as the credibility of the police officer(s) testimony. The court will then objectively assess all the aforementioned factors and determine whether the waiver was valid."

In weighing the facts of the instant case as they relate to the admissibility or exclusion of Choice's statement, we shall limit our discussion to the following issues: (1) Were valid *Miranda* warnings given to Choice by Agent King on October 17, 1974? (2) Was the effect of these warnings vitiated by Choice's prior silence when confronted by Agent Legg on October 16, 1974? (3) Was Choice physically and mentally capable of making a knowing, intelligent, and voluntary decision to waive his right to remain silent and his right to counsel?

1. *The validity of Miranda warnings given to Choice on October 17, 1974.*

Prior to any questioning, Agent King furnished Choice with a standard Bureau advice of rights form which tracks the language of the *Miranda* decision.[8] See United States v. Leland, 376 F.Supp. 1193, 1200 (D.Del.1974).

---

8. INTERROGATION; ADVICE OF RIGHTS

### YOUR RIGHTS

Place ————
Date ————
Time ————

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed————

Witness: ————
Witness: ————
Time: ————

Although we believe a preferable course of action would be for The Bureau agents to read the form outlining *Miranda* rights aloud, in contrast to handing the form to the person they are seeking to question, the latter procedure does not vitiate the warning *eo ipso*. In this respect, the method employed by Officer Mitchell is more desirable than that used by Agent King. However, under the facts of this case, we are satisfied that Agent King adequately advised Choice of his rights. Choice looked at the form, retained it in his possession for two or three minutes, and then affirmatively stated that he knew what it was and understood it. Less than three hours earlier, Choice had been extensively informed orally of these same rights by Officer Mitchell when he read the form to him, and had fully answered questions put by Officer Mitchell, thus demonstrating his comprehension of the significance of his agreement to talk then and there.

■ The fact that Choice did not sign the advice of rights form does not, *per se*, defeat the validity of a waiver of constitutional rights; *Miranda* requires only that a waiver of rights be made voluntarily, knowingly, and intelligently, and does not demand that such a waiver be in writing. United States v. Speaks, 453 F.2d 966, 969 (1st Cir. 1972), cert. den. 405 U.S. 1071, 92 S.Ct. 1522, 31 L. Ed.2d 804.

■ Moreover, Choice's refusal to sign the advice of rights form did not, under the curcumstances of this case, demonstrate a desire to remain silent. See United States v. Cassino, 467 F.2d 610, 620 (2d Cir. 1972), cert. den. 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590; United States v. Speaks, *supra*, 453 F.2d at 969; United States v. Crisp, 435 F.2d 354, 358 (7th Cir. 1970). On the contrary, his statement that he was familiar with and understood the form establishes his knowledge of its substance and implications; this fact is underscored by his willingness immediately after reading it to answer certain questions posed by the agents, coupled with his re-

fusal to speak when he did not wish to respond. His selective responses are the strongest evidence of his comprehension of his rights. Indeed, in this regard his complete understanding of his rights is further buttressed by the fact that his conduct, in answering certain questions, and refraining from responding to others, was consistent with his actions when interviewed by Officer Mitchell, who had read all of the rights aloud to Choice and questioned him extensively about his willingness to waive them. While a waiver of constitutional rights may not be inferred from mere silence, or from the fact that a statement was in fact eventually obtained, Miranda v. Arizona, *supra*, 384 U.S. at 475, 86 S.Ct. 1602, it is clear that "[w]aiver may be inferred from the language, acts, conduct and demeanor of a defendant", United States v. Cavallino, 498 F.2d 1200, 1204 (5th Cir. 1974).

2. *The effect of Choice's silence when confronted by Agent Legg on October 16, 1974.*

On October 16, 1974, Agent Legg visited the emergency ward of PGH and asked Choice if he wanted to make a statement. Choice did not explicitly refuse to make such a statement, but merely remained silent, without acknowledging the agent's presence. The constitutional issue, therefore, is whether Choice's silence on October 16, 1974, should have barred the admissibility of the statements taken the following day by Agent King.

In Miranda v. Arizona, the Supreme Court stated:

Once warnings have been given, the subsequent procedure is clear. If the *individual indicates in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the

right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

Id., 384 U.S. at 473–474, 86 S.Ct. at 1627.

This language would produce bizarre results if literally construed to mean that once the Fifth Amendment privilege is invoked, no statement taken thereafter can ever be admitted in evidence against the accused. Lower federal courts have generally declined to adopt such an extreme position. As the Court of Appeals for the Second Circuit *en banc* stated in United States v. Collins, 462 F.2d 792, 801–802 (2d Cir. 1972), cert. den. 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254.

We ordered rehearing in banc to resolve what appeared to be a difference of view whether a sentence in the majority opinion in Miranda v. Arizona [citation omitted.] "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," required that interrogation must cease forever [except in some circumstances where an attorney is present], or whether *Miranda* allowed renewal in proper circumstances. As a result of study of the additional briefs submitted by the parties and further discussion, we are agreed that what *Miranda* requires is

that "interrogation must cease" until new and adequate warnings have been given and there is a reasonable basis for inferring that the suspect has voluntarily changed his mind.

United States v. Collins was followed in Hill v. Whealon, 490 F.2d 629, 635 (6th Cir. 1974):

Hill contends that his confession was involuntary as a matter of law. He asserts that once he was advised of his *Miranda* rights and declined to make a statement, the police were precluded at all times thereafter from asking him any questions or talking with him about the case in any way. We join other circuits in refusing to adopt such a narrow construction of *Miranda*.

■ In some circumstances, of course, prior assertion of *Miranda* rights may render inadmissible a subsequent confession, particularly when interrogation continues after refusal by the suspect to speak, United States v. Crisp, 435 F.2d 354, 357 (7th Cir. 1970), cert. den. 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116; United States v. Wedra, 343 F.Supp. 1183, 1188, n. 24 (S.D.N.Y. 1972); or is resumed shortly thereafter, United States v. Clark, 499 F.2d 802, 807 (4th Cir. 1974) (interval of four hours).

■ In the instant case, we conclude that Choice's silence when confronted by Agent Legg does not affect the admissibility of statements given the following day to Agents King and Sackreiter.

FIRST: It is far from certain that Choice's silence on October 16, 1974, was in fact intended as an assertion of Fifth or Sixth Amendment rights. Agent Legg testified that Choice simply failed to respond when asked if he wished to make a statement:[9]

A. * * * I located Mr. Choice and identified myself as a special agent

---

9. We give no weight to Dr. Harris' statement that he is "about fifteen percent certain" that Choice requested an attorney in the emergency room at Osteopathic Hospital. Dr. Harris admitted that he had heard several patients request to see an attorney during his service in the emergency room, and that he would not recognize Choice if he saw him today. Stipulation, Choice's Exhibit #2 at the hearing on January 20, 1975.

and asked if he would care to talk to us and he remained silent.

Q. Do you remember how long you were in Mr. Choice's presence?

A. Approximately, I would guess, two or three minutes.

Q. Did you have any opportunity to advise him of his rights?

A. No, I didn't.

Q. Do you remember exactly what you said?

A. Identified myself as an agent and I asked Mr. Choice, "Would you care to tell us what happened?" He remained silent.

Q. Did he make any response at all?

A. No.

Q. Did he say anything at all while you were in his presence?

A. No, he didn't.

MR. BOVE: Cross examine.

THE COURT: You say you were with him about two or three minutes?

THE WITNESS: I was standing in the presence of Mr. Choice for two or three minutes as they were getting ready to take him upstairs for further x rays.

* * * * * *

Q. You asked him if he would like to make a statement? Were those your exact words?

A. Yes.

Q. Before you asked him that question did you give him any warnings about his constitutional rights?

A. At the moment before I contacted him, no. I did not. Had he been willing to talk to me I would have advised him of his rights.

THE COURT: Is it your statement, Agent Legg, that he made no response whatsoever? He didn't even say, "No, I won't talk to you."?

THE WITNESS: That's correct.

THE COURT: Just remained silent?

THE WITNESS: Right.

Q. Did Mr. Choice look at you?

A. Yes.

Q. Did he acknowledge your presence in any way?

A. No, he did not.

Q. Did you have any indication when you spoke to Mr. Choice that, in fact, he realized you were with the F.B.I.?

A. I don't know.

* * * * * *

Q. Agent Legg, Mr. Stein referred to defendant Choice's refusal to talk to you. Did he actually refuse to talk to you?

A. Well, he remained silent and they were in the process of taking him upstairs for further X rays and I don't know if it was a blank refusal or not. He just didn't say anything.

(N.T. 9–10, 12–13, 15, January 20, 1975).

SECOND: Even if Choice's silence on October 16, 1974, is interpreted as a claim of Fifth or Sixth Amendment rights, we are completely satisfied from the evidence adduced at the suppression hearing that "new and adequate warnings" were given prior to the interviews conducted the following day, and that "there is a reasonable basis for inferring that [Choice] voluntarily changed his mind", United States v. Collins, *supra*, 462 F.2d at 801–802.

We have previously determined that the *Miranda* warnings were given to Choice by Agent King comport with constitutional standards. We conclude from the following facts that whatever his attitude may have been on October 16th, he had changed his mind by the afternoon of October 17th, and voluntarily gave his statement with complete knowledge of the ramifications of his action.

On October 16, 1974, Choice was in the middle of treatment for gunshot wounds which had been inflicted a short time earlier. By midnight, however, diagnosis and emergency treatment had been completed, and Choice was allowed to rest in the orthopedic ward of PGH.

It was not until 1:00 P.M. on the following day that Officer Mitchell sought to interview Choice. In this respect the instant case is distinguishable from United States v. Crisp and United States v. Wedra, *supra* (immediate interrogation after refusal) and United States v. Clark, *supra* (four hour delay).

During the intervening period from the initial contact by Agent Legg on the afternoon of the 16th, until the interview by Officer Mitchell on the 17th, Choice had ample opportunity to reconsider his prior refusal to talk, if in fact his silence on the previous day was a refusal to communicate. Since he was apprehended at the bank, he may have felt that he had nothing further to lose by answering some questions posed by the Philadelphia police and the agents of The Bureau. In addition, Officer Mitchell showed Choice bank surveillance photographs which appeared in a Philadelphia newspaper. While it is not clear from the record at what point these photographs were shown or when Choice became aware of their existence, this knowledge may have affected Choice's willingness to talk thereafter. Agent King showed Choice a bank surveillance photograph prior to any questioning, although subsequent to *Miranda* warnings; he reported that Choice said that such photographs "tell the story and any jury in the world would arrive at a guilty verdict." [10]

In summary, therefore, assuming *arguendo* that Choice *refused* to speak to Agent Legg on October 16, 1974, it is clear that his refusal, under all of the circumstances of this case, cannot serve as a basis for excluding the subsequent statement given on October 17th. As the original panel stated in *Collins, supra,* 462 F.2d at 797:

> Here Collins was not subjected to any immediate re-interrogation, but only was asked to reconsider his refusal to answer. So long as such reconsideration is urged in a careful, noncoercive manner at not too great length and in

the context that a defendant's assertion of his right not to speak will be honored, it does not violate the *Miranda* mandate. In the circumstances of this case, even if Collins' confession were in response to Agent Hardin's request, it was not made involuntarily.

3. *Choice's physical and mental condition on October 17, 1974.*

 In order to determine the validity of the waiver of Fifth and Sixth Amendment rights by Choice, and the voluntariness of his statements, we must assess his physical and mental condition at the time statements were given. It is true that under certain circumstances a subsequent confession may be rendered inadmissible when a defendant has suffered gunshot wounds, has been hospitalized, and has had medication administered; see Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). This District, however, has rejected a *per se* rule that a serious gunshot wound must be presumed to leave its victim incapable of exercising free volition and making rational choices, United States v. Foster, 337 F.Supp. 696, 698 (E.D.Pa. 1972).

At the hearing on January 20, 1975, we took extensive evidence concerning Choice's condition on October 17, 1974, both by way of oral testimony and through the two stipulations of the parties.

While Choice was given emergency treatment at Osteopathic Hospital and at PGH on October 16, 1974, it is stipulated that by midnight all emergency and diagnostic care had been completed, and Choice was resting in the orthopedic ward at PGH.

When Officer Mitchell went to PGH on the afternoon of October 17, 1974, he was informed that Choice was awake and could talk. Mitchell testified that one of Choice's arms was in a sling, but that there were no tubes in his nose or mouth, and that when he approached the bed, Choice appeared to be awake. It

---

10. Exhibit G–3 at the hearing on January 20, 1975.

was never necessary to rouse him to get his attention. To the contrary, he was alert throughout the entire session.

Agent King requested permission to interview Choice, and this permission was granted by the head nurse after consultation by telephone with a physician.

Neither Officer Mitchell nor Agent King testified to any apparent lack of alertness, confusion, or signs of great physical discomfort or pain on the part of Choice.

Choice's rationality and comprehension are demonstrated, as noted, by his willingness to answer some questions and his refusal to respond to others, particularly those concerning the identity of the third man at the scene of the robbery. Moreover, he refused to sign a statement in the form of notes prepared by Officer Mitchell, refused to sign the waiver of rights form offered by Agent King, and stated at one point during the interview by Agent King that he did not wish to make any further statements without the advice of counsel, at which point the interview terminated.[11]

Each of these actions belies the claim that Choice was incapable of exercising free volition or making rational decisions. To the contrary, his actions demonstrate complete awareness of what was transpiring and the exercise of his own independent judgment throughout the proceedings. It would be ironic indeed if we were to hold that a confession will be admissible only when police authorities are able to tie up the entire confession package with a tidy bow, and will not be admissible under circumstances in which a defendant exercises the selectivity demonstrated by the facts in this case.

On the basis of this record, we conclude that Choice's physical and mental condition on October 17, 1974, did not render him incapable of waiving his right to counsel and his privilege against self-incrimination, nor render involuntary statements given to The Bureau.

For the reasons discussed above, we reaffirm that Choice validly waived his right to counsel and his privilege against self-incrimination in a knowing, intelligent, and voluntary manner, and that the statement made to Agent King was voluntary and admissible at the trial on the merits.[12]

11. Exhibit G–3 to the hearing on January 20, 1974.

12. Although the parties have not framed the issue in these terms, we conclude that, in addition to its admissibility under *Miranda* and the related case law, the statement was voluntary within the criteria of 18 U.S.C. § 3501.