**UNITED STATES of America**

v.

**John Clayton MASSEY.**

**No. 75–20–Cr–Oc.**

United States District Court,
M. D. Florida,
Ocala Division.

Aug. 29, 1977.

Robert S. Yerkes, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff.

Allan P. Clark, Jacksonville, Fla., for defendant.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This case is on remand from the United States Court of Appeals for the Fifth Circuit which reversed defendant's conviction. *United States v. Massey,* 550 F.2d 300 (5th Cir. 1977). The Fifth Circuit found that this Court's failure to suppress defendant's involuntary admissions to an F.B.I. agent, "obtained in violation of his *Miranda* rights," was crucial to the government's proof against him, and therefore required reversal. *Id.* at 308. Now, defendant John Clayton Massey ("Massey") has moved the Court to suppress (1) statements made by him while in custody, to a Secret Service agent, and (2) all evidence gained from leads supplied by the statements (nonsuppressed) that were unlawfully elicited by the F.B.I. agent.

## FACTS

Around 8:30 on the morning of September 24, 1975, Massey telephoned the F.B.I. office at Ocala, Florida. He told an agent that he had information concerning a conspiracy, in which he had been recruited to participate, to assassinate President Ford and Senator Kennedy. At Massey's suggestion, he and the agent met at the Oklawaha Bridge about one-half hour later. Massey drove a white panel truck. Massey revealed his true identity, said he had worked at a Super Test service station in the area, and discussed some details about the assassination conspiracy. He said that he had been contacted in June by a white male, in his fifties, who offered Massey an opportunity to make a large amount of money. At the man's directions, Massey quit his job at the gas station, returned to his mother's home in Royston, Georgia, and separated from his wife. He awaited further instructions. Massey said that during the first week of July an unidentified man called and instructed him to go to a certain truck stop in Fair Play, South Carolina, at 11:00 P. M. that night. Massey met the caller and two of them drove to a wooded area where they met four other white men. They told Massey that they were mercenaries training for guerilla activities in Central or South America. During the month of July Massey repeatedly met with the men to train. The sessions lasted for several days at a time and were at various locations in South Carolina and Georgia. Massey stated that he eventually discovered that the real purpose of the group was to assassinate President Ford and Senator Kennedy.

At the meeting at the Oklawaha bridge, Massey indicated that he was expected to meet one member of the group near Atlanta, on the morning of September 26. Massey requested $5,000 to continue his contact with the group and to assist the F.B.I. The agent told Massey that he did not have authority to agree to the payment and would have to contact his superiors in Jacksonville. The agent told Massey to call him about 1:30 that afternoon.

Massey called back at 1:00 P. M. and arranged for a second meeting at a truck stop near Ocala. At the meeting the agent agreed to pay Massey $5,000 for his aid if

Massey would submit to a polygraph test first. Massey refused. The agent then advised Massey that if his statements were untrue he could be guilty of making false statements to a government agency, and if the statements were true, he could be guilty of conspiring to assassinate the President. Massey agreed to telephone his decision to the agent by 3:30 P. M.

At 3:30 P. M. Massey called the agent, refused again to take a polygraph test, said he would remain in the Ocala area but would not disclose his location, and declared that he would call the agent at 8:30 A. M. the next day. At 7:45 that night Massey was arrested.

When Massey was arrested, he was given the *Miranda* warnings. At the F.B.I. office he refused to sign an advice and waiver-of-rights form. The F.B.I. agents tried several times to interrogate Massey, but he repeatedly indicated that he wished to consult a lawyer. The agents ceased their attempts at interrogation. Massey engaged in small talk only. The agents took him to the Marion County Jail where he spent the night.

About 6:30 A. M., the following day, two F.B.I. agents transported Massey to Jacksonville for an initial appearance before the United States Magistrate. Before the start of the trip, Massey was again given the *Miranda* warnings. En route to Jacksonville, the F.B.I. agents questioned Massey about the veracity of his statements, but Massey declined to discuss the plot until he could talk with a lawyer.

The agents arrived in Jacksonville with Massey around 8:30 A. M. They took him to an F.B.I. office, not a detention cell. Massey remained there more than three hours, awaiting an initial appearance before the Magistrate. During that time, a Secret Service agent gave Massey the *Miranda* warnings. Massey refused to sign a waiver or to discuss the plot until he had conferred with a lawyer. Nonetheless, Massey did make some statements to the Secret Service agent.

Finally, one of the F.B.I. agents who accompanied Massey to Jacksonville, and

was present when he spoke to the Secret Service agent, again attempted to interrogate Massey. Massey again refused to sign the waiver-of-rights form. The F.B.I. agent assured Massey, however, that he only wanted to question him about his itinerary, not about the plot. Massey then signed the waiver-of-rights form and furnished information which "provided the government with the details as to [Massey's] whereabouts during the time of the alleged plot and with witnesses who had seen [Massey] during this time." *United States v. Massey*, 550 F.2d at 306. That information, the Fifth Circuit ruled, must be suppressed because it was involuntarily given and obtained in disregard of Massey's right to counsel. *Id.* at 308.

## LAW

### I.  *Statements to Secret Service Agent*

■ When Massey was arrested, he indicated that he wanted to consult with a lawyer before answering any questions. During the trip from Ocala to Jacksonville the following morning, Massey again declined to talk with an F.B.I. agent without first consulting a lawyer. When he arrived in Jacksonville, rather than being placed in a detention cell, Massey was taken to an F.B.I. office where a Secret Service agent conducted a basic, background-information interview. Massey did not object to the background-information questioning. In the Fifth Circuit, as well as in several other circuits, such routine gathering of background, biographical information is not interrogation which must be preceded by the *Miranda* warnings. *United States v. Grant*, 549 F.2d 942, 946–47 (4th Cir. 1977); *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1111–13 (2d Cir. 1975); *United States v. Menichino*, 497 F.2d 935, 939–42 (5th Cir. 1974); *Farley v. United States*, 381 F.2d 357, 359 (5th Cir. 1967).

The Secret Service agent then gave Massey the *Miranda* warnings, but Massey "refused to sign a waiver" or to discuss the purported plot to assassinate President Ford and Senator Kennedy "until he had

talked with an attorney." *United States v. Massey,* 550 F.2d 300, 306 (5th Cir. 1977). According to the Secret Service agent, at that point Massey said, "But I want to explain something to you." The agent replied, "Well, you don't have to. You don't have to tell me anything until you talk to an attorney." Massey stated that he was not going to talk about the plot, but that he wanted to tell the agent something.

> "Massey said that the F.B.I. had nothing to worry about, that when he was in a bar in Ocala, he overheard an unidentified drunk talking about a plot to assassinate President Ford and Senator Kennedy. He felt that the F.B.I. had over-reacted to his story." *Id.* at 306.

In making those statements, Massey changed his story from an earlier account given to the F.B.I. agent at the Oklawaha Bridge near Ocala.

The question presented is whether the statements made by Massey to the Secret Service agent should be suppressed as involuntarily stated while being deprived of the right to counsel.

■ The Fifth Circuit Court of Appeals declared that Massey's statements to the Secret Service agent were spontaneous, voluntary, and apparently "not the result of interrogation or indirect attempts to gain information." *Id.* at 306. Consequently, those statements were not the product of any Fifth Amendment violation and are properly admissible under the guidelines of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Hill v. Whealon,* 490 F.2d 629, 635 (6th Cir. 1974); *United States v. Vasquez,* 476 F.2d 730, 732–33 (5th Cir. 1973), *cert. den.* 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973). Nevertheless, Massey argues that those statements were obtained in violation of his Sixth Amendment right to counsel, and that they must therefore be suppressed as the tainted fruit of a poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Massey relies on a recent Supreme Court decision, *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The defendant had surrendered to police in Davenport, Iowa, where he was told by a lawyer in Des Moines, Iowa, via the telephone, as well as a lawyer with him in Davenport, not to talk with police until he had consulted with the lawyer in Des Moines. Moreover, the police had been instructed by both lawyers not to interrogate the defendant until he had arrived in Des Moines and conferred with his lawyer. Instead, en route to Des Moines, the police employed psychologically tactical language to appeal to the defendant's deep religious emotions, in order to elicit information concerning the location of the homicide victim. The Supreme Court held that such tactics were "tantamount to interrogation," *id.* at 399, 97 S.Ct. at 1240, 51 L.Ed.2d at 437, and that they therefore violated the defendant's absolute Sixth Amendment right to counsel. *Id.* at 401, 404, 405, 97 S.Ct. at 1239, 1241, 1242, 51 L.Ed.2d at 436, 438, 439; *Escobedo v. Illinois,* 378 U.S. 478, 492, 84 S.Ct. 1758, 1766, 12 L.Ed.2d 977, 989 (1964); *Massiah v. United States,* 377 U.S. 201, 205–06, 84 S.Ct. 1199, 1202–03, 12 L.Ed.2d 246, 250 (1964).

■ The Supreme Court expressly held that, under the circumstances of *Brewer v. Williams, supra,* the defendant had not, without notice to his counsel, waived his Sixth Amendment right to counsel. The Court emphasized that the government must meet a strict standard of proof to demonstrate a waiver of the right to counsel, and that the courts will "indulge in every reasonable presumption against waiver." *Id.* at 403 of 430 U.S., at 1242 of 97 S.Ct., at 439–40 of 51 L.Ed.2d. However, the Court expressly declined to hold that a defendant could not waive his Sixth Amendment right to counsel under demonstrable and appropriate circumstances.

> "The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." *Id.* at 406, 97 S.Ct. at 1243, 51 L.Ed.2d at 441.

There is, in other words, no automatic, per se violation of the Sixth Amendment whenever a defendant in custody makes incriminating statements to law enforcement authorities, without the presence of counsel. *United States v. Brown,* 551 F.2d 639, 643 (5th Cir. 1977); *United States v. Williams,* 526 F.2d 1000, 1002–03 (6th Cir. 1975); *Smith v. United States,* 505 F.2d 824, 829 (6th Cir. 1974); *United States v. Cavallino,* 498 F.2d 1200, 1202–04 (5th Cir. 1974); *Hill v. Whealon,* 490 F.2d at 635; *United States v. Vasquez,* 476 F.2d at 733; *United States v. Springer,* 460 F.2d 1344, 1350–52 (7th Cir. 1972). Whether there is a waiver or a violation of the Sixth Amendment right to counsel "turns on the facts and circumstances surrounding the particular interrogation." *United States v. Brown,* 551 F.2d at 644. Where there is no subterfuge or chicanery by law enforcement agents, *Smith v. United States,* 505 F.2d at 829, and where a defendant deliberately chooses to initiate or continue conversation about some subject matter, *Michigan v. Mosley,* 423 U.S. 96, 103–06, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313, 321–22 (1975); *Smith v. United States,* 505 F.2d at 829; *United States v. Williams,* 526 F.2d at 1003; *United States v. Cavallino,* 498 F.2d at 1203–04, the statements violate neither the Fifth Amendment right against self-incrimination nor the Sixth Amendment right to counsel. *Smith v. United States,* 505 F.2d at 829. They are voluntary expressions, and as such, they constitute a waiver of the Sixth Amendment right to counsel.

For example, in *United States v. Williams,* 526 F.2d 1000 (6th Cir. 1975), the defendant was convicted of possessing an unregistered firearm. When he had been arrested by his stopped car, on the highway, the defendant had been advised of his *Miranda* rights. He was repeatedly advised of them later at the police station. *Id.* at 1002–03. While being fingerprinted, the defendant replied to an official's question about the source of the firearm. *Id.* at 1003. In the absence of "extended or repeated questioning," and with a full understanding of his rights to remain silent and to assistance of counsel, the defendant's statement about where he had obtained the shotgun was a voluntary expression. *Id.*

In *United States v. Vasquez,* 476 F.2d 730 (5th Cir. 1973), the defendant was also convicted of possession of an unregistered firearm. While in custody in a county jail, the defendant was advised of his *Miranda* rights by an F.B.I. agent and "executed a written waiver of those rights." *Id.* at 732. The defendant refused to discuss a purported shooting incident in which the firearm might have been used, but he did consent to discuss the rifle. *Id.* The trial court denied his motion to suppress the statements about the gun, and the Court of Appeals affirmed. The Fifth Circuit held that "by voicing a general willingness to talk, subject only to a limited desire for silence," *id.,* the defendant had opened up permissible questioning about "any unlimited subjects." *Id.* at 733. Having been "carefully apprised of his right to have the advice of counsel," such conversation by the defendant constituted a waiver, not a denial, of that right. *Id.*

In *Smith v. United States,* 505 F.2d 824 (6th Cir. 1974), three defendants were convicted of transporting nearly twenty-five hundred reels and tapes of obscene materials in interstate commerce. One of the three defendants refused to waive his *Miranda* rights. Despite his refusal, however, he volunteered incriminating statements about the ownership and transportation of the obscene items. *Id.* at 826. The trial court denied his motion to strike testimony regarding those incriminating admissions, and the Sixth Circuit affirmed. *Id.* at 829. Although he had refused to waive his rights, the defendant did consent to provide background information, and it was in the course of doing so that he made the admissions. The Sixth Circuit scrutinized the circumstances and found no indication of subterfuge. *Id.* Consequently, the Court held that the police were free to "continue the interrogation in any subject-area" that the defendant desired to discuss, and that neither the defendant's Fifth Amendment nor Sixth Amendment rights had been violated. *Id.*

Likewise, in *United States v. Cavallino,* 498 F.2d 1200 (5th Cir. 1974), the defendant was convicted of conspiracy to rob and robbery of a federally insured bank. When he was arrested on the street by state law enforcement officers, the defendant was informed of his *Miranda* rights. They were twice repeated to him at the police station "before any incriminating statement was made." *Id.* at 1202. At that time, the defendant expressed a desire to consult with a lawyer. *Id.* at 1202, 1203. Nevertheless, he began a conversation with the police, during which he volunteered incriminating statements. *Id.* at 1202. The Fifth Circuit held that those statements were not the result of police interrogation, but instead constituted a knowing, voluntary waiver of the defendant's right to counsel. *Id.* at 1202, 1203–04.

> "Waiver by a defendant of his constitutional right to consult with or to have an attorney present does not require an express statement or disavowal. Waiver may be inferred from the language, acts, conduct and demeanor of a defendant." *Id.* at 1204.

Finally, in *United States v. Zamarripa,* 544 F.2d 978 (8th Cir. 1976), the defendant was convicted of fraudulent interstate transportation of stolen money orders. While he was in custody before trial, he had been interviewed by an F.B.I. agent. Although the defendant refused to sign a waiver-of-rights form, he did agree to talk with the agent. The defendant then admitted signing and passing the money orders. In affirming the conviction and finding the statements voluntary, the Eighth Circuit declared that a waiver

> " . . . need not assume any particular form; it may be made in writing on a printed format or it may be made orally by replying to questions . . . A valid waiver of rights does not require an express declaration to that effect . .; nor does lack of such a declaration necessarily indicate a defendant's desire to remain silent . . . . The validity of a waiver is to be determined from all of the surrounding circumstances. . . .

"When the circumstances indicate that a defendant knew of his right to remain silent and to have counsel, yet intelligently waived that right by voluntarily answering questions, his refusal to sign a written waiver does not render a confession or an incriminating statement inadmissible." Id. at 981.

In the present case, Massey had been repeatedly informed of his rights to remain silent and to have the assistance of counsel. He demonstrated his understanding of those rights by repeatedly refusing to discuss the details of the alleged assassination plot until he could consult with a lawyer. Notwithstanding that understanding, and in the clear face of an admonition that he need not talk about anything until he consulted a lawyer, Massey chose to offer his remarks about the lack of any real reason for government authorities to worry about an assassination plot. Those statements, knowingly and voluntarily made with an understanding of his rights, constituted a waiver by Massey of his right to confer with counsel before making them. They are therefore properly admissible and should not be suppressed.

## II.  *Tainted Evidence from Unlawful Leads*

Because the F.B.I. agents did not scrupulously honor Massey's repeated assertion, while in custody, of his right to counsel and his right to remain silent, *Michigan v. Mosley,* 423 U.S. at 101 n. 7 and 103, 96 S.Ct. at 325 n. 7 and 326, 46 L.Ed.2d at 320 n. 7 and 321; *Miranda v. Arizona,* 384 U.S. at 474–75, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723–24, all incriminating statements made by him to those agents during custodial interrogation are inadmissible and must be suppressed. *United States v. Massey,* 550 F.2d at 308. The execution of a purported, written waiver-of-rights, standing alone, cannot defeat the presumptive coercion of the incriminating statements. *Id.; Harney v. United States,* 407 F.2d 586, 590 (5th Cir. 1969).

Now, Massey seeks to have excluded and suppressed all of the evidence, testimonial

and nontestimonial, that was obtained from leads supplied by those incriminating statements. He argues that such indirect evidence is the tainted fruit from the poisonous tree of his unlawfully obtained admissions to the F.B.I. The issue presented is whether any or all of the government's testimonial and nontestimonial evidence must be excluded as the tainted, indirect fruit of the F.B.I.'s coercive interrogation and denial of Massey's right to counsel.

A. *Exclusionary Rule and the "Tainted Fruit of the Poisonous Tree" Doctrine.*

The origin of the exclusionary rule is *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). In that case, federal officers, without a warrant, broke into the defendant's home while he was at work, searched it, and seized a plethora of items, including books, papers, and a variety of articles. When the defendant petitioned for return of the property, although some was returned, the United States district attorney retained the rest for the express purpose of using it as evidence at the defendant's trial. The defendant had been indicted for use of the mill in gambling enterprises. The trial court admitted the evidence over the defendant's objection. *Id.* at 388–89, 34 S.Ct. at 342–43, 58 L.Ed. at 654. The issue before the Supreme Court was the right of the government to keep, and use as evidence, materials obtained by a warrantless search and seizure that violated the Fourth Amendment. *Id.* at 393, 34 S.Ct. at 344, 58 L.Ed. at 655. The Court ruled that the search and seizure had in fact violated the Fourth Amendment, and that

use of the unlawfully obtained materials as evidence in the trial was reversible error. *Id.* at 398, 34 S.Ct. at 346, 58 L.Ed. at 657–58.[1]

In *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the Supreme Court expanded the exclusionary doctrine, to reach not only the unlawfully seized evidence, but also the information gained from that evidence. While the individual defendants were in custody on an arrest following an indictment, federal officers, "without a shadow of authority, went to the office of [the defendants'] company and made a clean sweep of all the books, papers, and documents found there." *Id.* at 391, 40 S.Ct. at 182, 64 L.Ed. at 321. The government attorney copied all of the pertinent papers and returned the originals in accordance with a court order. On the basis of information contained in the duplicates, the government subpoenaed production of the original papers and documents before a grand jury. When the defendants refused to produce the original materials, they were held in contempt; and an individual defendant was incarcerated until, by complying with the subpoena, he purged himself of his contempt.[2] *Id.* In reversing the contempt judgment, the court declared that the essence of the Fourth Amendment prohibition against unlawful seizure of evidence is

" . . . not merely [that] evidence so acquired shall not be used before the court, but that it shall not be used at all." *Id.* at 392, 40 S.Ct. at 183, 64 L.Ed. at 321.

Although the evidence that the government subpoenaed was the same material original-

---

1. Before *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), courts had followed the common law rule that all competent evidence, notwithstanding its unlawful acquisition, was admissible. The Supreme Court abrogated that rule in *Weeks v. United States, supra.* Evidence seized in violation of the Fourth Amendment is now excluded from the government's "lawful proof" at trial. *Bumper v. North Carolina,* 391 U.S. 543, 552, 88 S.Ct. 1788, 1793, 20 L.Ed.2d 797, 804 (1968) (Harlan, J., concurring).

2. Plainly, the contempt by Frederick W. Silverthorne was considered by the court to be

civil in nature because it was conditional in character, with the primary purpose being to secure compliance, not to punish or vindicate. *Shillitani v. United States,* 384 U.S. 364, 368–71, 86 S.Ct. 1531, 1534–36, 16 L.Ed.2d 622, 626–28 (1966); *United States v. Spectro Foods Corp.,* 544 F.2d 1175, 1182–83 (3d Cir. 1976); *Douglass v. First Nat'l Realty Corp.,* 177 U.S. App.D.C. 409, 412–13, 543 F.2d 894, 897–98 (1976); *Hoffman v. Local 888, Beer Drivers & Salesmen's Union,* 536 F.2d 1268, 1273 (9th Cir. 1976); *IBM Corp. v. United States,* 493 F.2d 112, 115–16 (2d Cir. 1973).

ly seized unlawfully, the court premised its decision on *Flagg v. United States,* 233 F. 481 (2d Cir. 1916), where, under similar circumstances, the Court of Appeals had excluded both primary and secondary evidence that was unconditionally acquired. Hence, the Supreme Court's decision in *Silverthorne* applied the exclusionary rule of *Weeks v. United States, supra,* to the incipient distinction between direct and indirect evidence.

Finally, in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court extended the exclusionary rule of *Weeks v. United States, supra,* both to evidence which was the direct product of an unlawful search and seizure, and to evidence which was obtained from leads supplied by the direct evidence, namely, indirect evidence. *Id.* at 484, 83 S.Ct. at 416, 9 L.Ed.2d at 453. The court adopted the "tainted fruit of the poisonous tree" metaphor, *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939), to describe the complete exclusionary doctrine articulated. *Wong Sun v. United States,* 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455. In addition, the court clarified that there are two exceptions to the tainted fruit of the poisonous tree doctrine,[3] situations in which ostensibly tainted indirect evidence can be purged and

---

**3.** The first exception was stated by Mr. Justice Holmes in *Silverthorne Lumber Company v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920):

" . . . the facts thus obtained [do not] become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . . ."

There are some decisions that purport to find a third exception to the tainted fruit of the poisonous tree doctrine: the inevitable discovery rule. That exception would allow indirect evidence to be introduced, notwithstanding its derivative connection to the excluded direct evidence resulting from unconstitutional conduct by law enforcement officers, if it were inevitable that such indirect evidence would have been discovered and acquired from an independent source in any event. *United States v. Ceccolini,* 542 F.2d 136, 140–41 (2d Cir. 1976), *cert. granted* 431 U.S. 903, 97 S.Ct. 1693, 52 L.Ed.2d 386 (1977); *United States ex rel. Owens v. Twomey,* 508 F.2d 858, 865–66 (7th Cir. 1974) (habeas corpus petition); *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 927–28 (3d Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Falley,* 489 F.2d 33, 40–41 (2d Cir. 1973); *Gissendanner v. Wainwright,* 482 F.2d 1293, 1297 (5th Cir. 1973) (habeas corpus petition); *United States v. Cole,* 463 F.2d 163, 171–74 (2d Cir. 1972), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972); *United States v. Seohnlein,* 423 F.2d 1051, 1053 (4th Cir. 1970), *cert. denied,* 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Wayne v. United States,* 115 U.S.App.D.C. 234, 318 F.2d 205, 209 (1963), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *United States v. Kelly,* 414 F.Supp. 1131, 1140 (W.D. Mo.1976), *rev'd on other grnds., expressly leaving the question undecided,* 547 F.2d 82, 86 (8th Cir. 1977); *United States v. Griffin,* 413 F.Supp. 178, 183–85 (E.D.Mich.1976); *United States ex rel. Roberts v. Ternullo,* 407 F.Supp.

1172, 1176–78 (E.D.N.Y.1976) (habeas corpus petition). *See also United States v. Magda,* 547 F.2d 756, 767 (2d Cir. 1976) (Motley, J., dissenting).

The Seventh Circuit expressly endorsed the inevitable discovery rule as a third exception to the tainted fruit of the poisonous tree doctrine, even though the facts satisfied the independent source exception as well. *United States ex rel. Owens v. Twomey,* 508 F.2d at 865–66. The Second Circuit recently clarified that it also has adopted the inevitable discovery exception. *United States v. Ceccolini,* 542 F.2d 136, 140–41 (2d Cir. 1976), *citing United States v. Cole,* 463 F.2d 163, 171–74 (2d Cir. 1972), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). Other earlier Second Circuit decisions had employed the actual independent source exception, either alone or in conjunction with the inevitable discovery rule, hence, the approval and acceptance of a third exception was not inescapable. For example, in *United States v. Falley,* 489 F.2d 33, 40–41 (2d Cir. 1973), the Second Circuit, while articulating the inevitable discovery rule, relied upon the independent source exception for its decision. *See United States v. DeMarce,* 513 F.2d 755, 758 (8th Cir. 1975). Similarly, the district court in *United States ex rel. Roberts v. Ternullo,* 407 F.Supp. 1172, 1176–78 (E.D.N.Y.1976), cited earlier Second Circuit cases concerning the actuality test for the purgative exceptions, and discussed the inevitable discovery rule, but also found that the independent source exception was satisfied by the presence of the evidence in continuingly extant public records.

Likewise, while an inevitable discovery approach was employed in *United States v. Seohnlein,* 423 F.2d 1051, 1053 (4th Cir. 1970), *cert. denied,* 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970), it was an alternative analysis to the conclusion that in fact the indirect evidence in question had been acquired from an independent, untainted source. The District of Columbia Circuit, in *Wayne*

854

used. First, evidence which, although apparently the indirect result of unlawfully acquired primary evidence, was actually obtained from an independent source, need not be excluded. Second, where the causal connection between the indirect evidence and the unlawful conduct that led to the direct evidence is or has become attenuated —physically, temporally, logically, or otherwise—the taint of the indirect evidence is dissipated, and the evidence is admissible. *Id.* at 487, 83 S.Ct. at 417, 9 L.Ed.2d at 455; *Nardone v. United States,* 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 311–12; *Silverthorne Lumber Co. v. United States,* 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321; *United States v. Houltin,* 525 F.2d 943, 947, 949 (5th Cir. 1976); *United States v. Hearn,* 496 F.2d 236, 244 (6th Cir. 1974), *cert. den.* 419 U.S. 1048, 95 S.Ct. 622, 42 L.Ed.2d 642

*v. United States,* 115 U.S.App.D.C. 234, 318 F.2d 205, 209 (1963), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), also found that the government had shown an actual independent acquisition of its evidence, despite the discussion of inevitability.

Finally, the district court in *United States v. Griffin,* 413 F.Supp. 178, 183–85 (E.D.Mich. 1976) held that:

" . . . the evidence sought to be introduced would have been available to the government regardless of the illegality with respect to [the defendant] . . ."

*Id.* at 185. Nevertheless, the Sixth Circuit has not articulated or approved the inevitable discovery rule as an exception to the tainted fruit of the poisonous tree doctrine. The Eighth Circuit has intentionally avoided the question. *United States v. Kelly,* 547 F.2d 82, 86 (8th Cir. 1977), *rev'g on othr grnds.,* 414 F.Supp. 1131 (W.D.Mo.1976). The Third Circuit allowed a district court's use of the inevitable discovery rule as an exception to putatively tainted evidence, in *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 927–28 (3d Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); but the decision is confusing in view of the court's discussion of the government's burden of proof. See discussion following in this footnote.

Nonetheless, the inevitable discovery rule is aberrant and unorthodox. First, the United States Supreme Court has never announced or approved such an exception, *Parker v. Estelle,* 498 F.2d 625, 629–30 n. 12 (5th Cir. 1974); *United States v. Castellana,* 488 F.2d 65, 68 (5th Cir. 1974) *aff'd in part and rev'd in part on other grnds.,* 500 F.2d 325 (5th Cir. 1974) (en banc); *United States v. Bowdach,* 414 F.Supp. 1346, 1354 (S.D.Fla.1976); and neither have most of the courts of appeals. *See e. g., United States v. Kelly,* 547 F.2d 82, 86 (8th Cir. 1977), *rev'g on other grnds. and expressly leaving the question undecided,* 414 F.Supp. 1131 (W.D. Mo.1976).

Second, apart from one anomalous deviation, *Gissendanner v. Wainwright,* 482 F.2d 1293, 1297 (5th Cir. 1973), the Fifth Circuit has consistently rejected such a third exception to the tainted fruit of the poisonous tree doctrine. *United States v. Houltin,* 525 F.2d 943, 947–50 (5th Cir. 1976); *Parker v. Estelle,* 498 F.2d 625,

629–30 n.12 (5th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *United States v. Castellana,* 488 F.2d 65, 68 (5th Cir. 1974), *aff'd in part and rev'd in part on other grnds.,* 500 F.2d 325 (5th Cir. 1974) (en banc); *United States v. Resnick,* 483 F.2d 354, 357 (5th Cir. 1974), *cert. denied* 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973); *see United States v. Kelly,* 547 F.2d 82, 86 n. 9 (8th Cir. 1977), *rev'g on other grnds.,* 414 F.Supp. 1131 (W.D.Mo.1976); *United States v. Bowdach,* 414 F.Supp. 1346, 1354 (S.D.Fla.1976).

Third, an inevitable discovery exception would alter the test of whether indirect evidence is tainted or purged of taint. The test would become a hypothetical, instead of an actual, one: regardless of the government's actual use of the illegally obtained direct evidence, so long as it is arguable that the government, had it made the effort, would have inevitably discovered the indirect evidence from an independent source, the indirect evidence would be considered free of taint and therefore admissible. Such a result is contrary to the overwhelming body of decisional law that the taintedness test is actual, not hypothetical. See e. g., cases cited in text *infra,* and the discussion in *United States ex rel. Roberts v. Ternullo,* 407 F.Supp. 1172, 1176–78 (E.D.N.Y. 1976).

Furthermore, the hypothetical test, which the inevitable discovery rule invokes, results in the final burden under that rule being borne by the defendant. The government need only claim that, despite its failure to actually do so, if it had pursued its investigation, the discovery of the indirect evidence would have been inevitable. Under an inevitable discovery exception, the defendant must negate that claim and demonstrate that the only way the government could have acquired the indirect evidence was by means of the illegally obtained direct evidence. *See Rice v. Wolff,* 388 F.Supp. 185, 205 and n. 2 (D.Neb.1974), *aff'd* 513 F.2d 1280 (8th Cir. 1975), *rev'd on other grnds. sub nom. Stone v. Powell,* 428 U.S. 465, 471–74 and n. 4, 96 S.Ct. 3037, 3042 and n. 4, 49 L.Ed.2d 1067, 1074–75 and n. 4 (1976). In other words, the defendant must show that the taint from the illegal acquisition of the direct evidence *could not possibly be purged* through an independent source of discovery by the government.

(1974); *United States v. Borcich*, 460 F.2d 1391, 1394 (10th Cir. 1972); *United States v. Fike*, 449 F.2d 191, 193 (5th Cir. 1971); *Etheridge v. United States*, 380 F.2d 804, 808 (5th Cir. 1967).

The taintedness test is not a hypothetical one of possibilities: "but for" the unlawful acquisition of the direct evidence, the indirect evidence would not have been obtained. Instead, the test is an actual one: did in fact the government use the illegally acquired direct evidence to obtain the indirect evidence? Was in fact the causal connection between the indirect evidence and the unlawful seizure of the direct evidence unavoidable? *Wong Sun v. United States*, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455; *United States v. Houltin*, 525 F.2d at 947; *United States v. Brandon*, 467 F.2d 1008, 1010–11 (9th Cir. 1972); *Peterson v. United States*, 411 F.2d 1074, 1079 (8th Cir. 1969); *United States v. Ruffin*, 389 F.2d 76, 79 (7th Cir. 1968); *Williams v. United States*, 382 F.2d 48, 51 (5th Cir. 1967). Once a defendant makes a prima facie showing of unconstitutional conduct by the government, in its evidence gathering, the burden shifts to the government to demonstrate, by a preponderance of the evidence, that one of the two exceptions in fact applies.[4] *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176, 192 (1969); *Nardone v. United States*, 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 312; *United States v. Tweel*, 550 F.2d 297, 300 (5th Cir. 1977); *United States v. De La Fuente*, 548 F.2d 528, 533–34 (5th Cir. 1977); *United States ex rel. Hudson v. Cannon*, 529 F.2d 890, 895 (7th Cir. 1976); *United States v. Houltin*, 525 F.2d 943, 947 (5th Cir. 1976); *United States v. Falley*, 489 F.2d 33, 41 (2d Cir. 1973); *United States v. Seiffert*, 463 F.2d 1089, 1091 (5th Cir. 1972); cf. *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212, 226 (1972); *Lego v. Twomey*, 404 U.S. 477, 486–87, 92 S.Ct. 619, 625–26, 30 L.Ed.2d 618, 626 (1972).

## B. *Fifth Amendment and the Exclusionary Rule.*

The cases which mark the origin and development of the tainted fruit of the poisonous tree doctrine involved violations of the Fourth Amendment guarantee against unreasonable searches and seizures. The primary purposes of the tainted fruit of the poisonous tree doctrine have been (1) to deter law enforcement officers from unreasonable searches and seizures, and (2) to protect the integrity of the judiciary from the effects of unlawful government conduct. *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416, 424–25 (1975).

The Fifth Amendment, however, provides an independent basis for application of the exclusionary rule: incriminating statements involuntarily made must be excluded. *Brown v. Illinois*, 422 U.S. at 601, 95 S.Ct. at 2260, 45 L.Ed.2d at 426, and 422 U.S. at 606 n. 1, 95 S.Ct. at 2263 n. 1, 45 L.Ed.2d at 429 n. 1. (Powell, J., concurring); *Miranda v. Arizona*, 384 U.S. 436, 489–90, 86 S.Ct. 1602, 1635–36, 16 L.Ed.2d 694, 732–33 (1966); *Spano v. New York*, 360 U.S. 315, 320–21, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265, 1270 (1959); *United States ex rel. Hudson v. Cannon*, 529 F.2d at 892. Similarly, failure to caution an accused in custody with the *Miranda* warnings will result in the exclusion of incriminating statements. *Brown v. Illinois*, 422 U.S. at 606 n. 1, 95 S.Ct. at 2263 n. 1, 45 L.Ed.2d at 429 n. 1. (Powell, J., concurring); *Orozco v. Texas*, 394 U.S. 324, 326–27, 89 S.Ct. 1095, 1096–97, 22 L.Ed.2d 311, 314–15 (1969); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Fifth Amendment guarantee is against self-incrimination and the *Miranda* warnings do not confer rights separate from that privilege; they were designed to safeguard it. *Brown v. Illinois*, 422 U.S. at 600, 95 S.Ct. at 2260, 45 L.Ed.2d at 425; *Michigan v. Tucker*, 417 U.S. 433 at 444, 94 S.Ct. 2357 at

---

4. The Third Circuit employed a clear and convincing evidence standard in *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 929 (3d Cir. 1974). Nevertheless, the overwhelming decisional law holds that the government's burden of demonstrating an exception to the tainted fruit of the poisonous tree doctrine is satisfied by a preponderance of the evidence.

2364, 41 L.Ed.2d 182 at 193; *Null v. Wainwright*, 508 F.2d 340, 342 (5th Cir. 1975). The purposes served by the exclusionary rule in the context of Fifth Amendment violations are analogous to the purposes served by that rule in the Fourth Amendment context. Those purposes are (1) to deter the abhorrent methods of coercive interrogation, and (2) to prevent the use of intrinsically untrustworthy, coerced statements from undermining the integrity of the courts. *Brown v. Illinois*, 422 U.S. at 601, 95 S.Ct. at 2260, 45 L.Ed.2d at 425; *Spano v. New York*, 360 U.S. 315, 320–21, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265, 1270 (1959); *United States ex rel. Hudson v. Cannon*, 529 F.2d at 892, 893.

■ While the Fourth Amendment prohibition against unreasonable searches and seizures, and the Fifth Amendment privilege against self-incrimination are intimately related, and are to some extent overlapping, the scope of the exclusionary doctrine under the Fourth Amendment is far greater than under the Fifth Amendment. *Brown v. Illinois*, 422 U.S. at 601, 95 S.Ct. at 2260, 45 L.Ed.2d at 425–26. Even where a defendant's incriminating admissions are voluntary under the Fifth Amendment, they might be excluded as the product of a Fourth Amendment violation. For example, in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the defendant's apartment was broken into by the police, and he was subsequently arrested, all without probable cause. Once he was taken to the police station, the defendant was repeatedly given the *Miranda* warnings and was repeatedly questioned. He made two incriminating admissions, signing a written copy of the first, but refusing to sign a written copy of the second. In affirming his conviction for murder, the Illinois courts assumed that the *Miranda* warnings and the voluntariness of the admissions under the Fifth Amendment standard rendered the statements admissible. *Id.* at 600–01, 95 S.Ct. at 2260, 45 L.Ed.2d at 425–26. The Supreme Court held, however, that notwithstanding the *Miranda* warnings and the purported voluntariness of the admissions, they had not been purged from the taint of the Fourth Amendment violations. The Court concluded that the state had failed to demonstrate that the admissions qualified as one of the exceptions to the tainted fruit of the poisonous tree doctrine. *Id.* at 601–05, 95 S.Ct. at 2260–63, 45 L.Ed.2d at 426–28.[5]

C. *Fifth Amendment and the "Tainted Fruit of the Poisonous Tree" Doctrine.*

■ In *Michigan v. Tucker*, 417 U.S. 433, 452 n. 26, 94 S.Ct. 2357, 2368, n. 26, 41 L.Ed.2d 182, 197 n. 26 (1974), the Supreme Court expressly declined to decide[6] whether

5. *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), is a case illustrating that voluntary admissions under pre-*Miranda* standards, cf. *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), were the inadmissibly tainted fruit of Fourth Amendment violations. The case illustrates, as well, the application of the exclusionary doctrine to the distinction between direct and indirect evidence. The defendant and a passenger had been stopped in their car by a police officer. In checking the car, he noticed a can of black paint and a paint brush under the front seat. Having no valid reason to detain the defendant and his passenger, the police officer nonetheless followed the car to the defendant's home. Later the policeman learned of the defacing of a synagogue with black paint. Without a warrant and without any exception to the warrant requirement, the police officer returned to the defendant's home, entered and searched the garage, and seized the can of paint and paint brush. A valid arrest warrant was obtained and the defendant was arrested. Shortly after his arrest, the defendant apparently volunteered admissions, and later confessions, during questioning. The Supreme Court reversed the defendant's convictions, ruling that the direct, tangible evidence (the paint brush and can of paint) must be excluded because they were obtained by the unlawful search and seizure. *Id.*, 375 U.S. at 87–88, 84 S.Ct. at 230–231, 11 L.Ed.2d at 174. Additionally, the Court held that, on remand, the defendant should be allowed an opportunity to show that his admissions and confessions were indirect, tainted fruit induced by the unlawful search of the garage and seizure of the inadmissible direct evidence. *Id.* at 90–91, 84 S.Ct. at 232–233, 11 L.Ed.2d at 175–76.

6. Mr. Justice Brennan believes that the Court already decided that the tainted fruit of the poisonous tree doctrine applies when the *Miranda* warnings are not given or are defective.

the "tainted fruit of the poisonous tree" doctrine would apply to evidence derived from a defendant's incriminating statements made without the prescribed *Miranda* warnings. *United States v. Castellana*, 500 F.2d 325, 327 n. 7 (5th Cir. 1974) (en banc). The Court's reticence on that question is explained, however, because (1) the *Miranda* warnings do not confer constitutional rights, but are procedural safeguards to reinforce Fifth and Sixth Amendment rights; and (2) under the pre-*Miranda* facts of *Michigan v. Tucker, supra,* there was no violation of the Fifth or Sixth Amendments. Thus, the tainted fruit of the poisonous tree doctrine did not apply. 417 U.S. at 444–46 and n. 19, 94 S.Ct. at 2364 and n. 19, 41 L.Ed.2d at 192–94 and n. 19; *United States ex rel. Hudson v. Cannon*, 529 F.2d at 894.

The Supreme Court has not applied that doctrine to indirect testimonial evidence of third persons, or to the indirect, nontestimonial evidence resulting from a defendant's incriminating statements obtained in violation of the Fifth Amendment. The Court has, however, squarely confronted the issue of using the indirect, testimonial evidence of a defendant himself, when that testimony stems from an earlier, involuntary confession.

### 1. *Indirect Testimonial Evidence: The Accused's.*

In *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the defendant's first conviction had been reversed because his earlier, inadmissible confessions had been introduced. During the first trial, the defendant took the stand and testified in order to counter the effect of the confessions. At the second trial, the government did not use the confessions, but read into evidence the defendant's testimony at the first trial. The Supreme Court reversed the second conviction because of the failure to exclude the defendant's first-trial testimony.

". . . the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree, to invoke a timeworn metaphor." *Id.* at 222, 88 S.Ct. at 2010, 20 L.Ed.2d at 1051.

The Court employed the actuality test of that doctrine, inquiring why the defendant decided to testify at his first trial.

"If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* at 223, 88 S.Ct. at 2010, 20 L.Ed.2d at 1052.

The government did not meet its burden to show that the defendant's first-trial testimony had been obtained by one of the two purgative exceptions, rather than as the induced result of the involuntary and unlawfully used confessions. *Id.* at 225 and n. 12, 226, 88 S.Ct. at 2011 n. 12, 2012, 20 L.Ed.2d at 1053 and n. 12.

The Courts of Appeals have also applied the tainted fruit of the poisonous tree doctrine to a defendant's own testimonial evidence indirectly obtained from earlier, involuntary admissions. The application of that doctrine in such cases has not been automatic or per se; rather, it has depended on an analysis of the total circumstances of each case. *Gilpin v. United States*, 415 F.2d 638, 641–42 (5th Cir. 1969); *Harney v. United States*, 407 F.2d 586, 589 (5th Cir. 1969); *Evans v. United States*, 375 F.2d 355, 361 (8th Cir. 1967), *cert. den.* 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428 (1970). The Eighth Circuit was one of the earliest to apply the doctrine. In *Evans v. United States*, 375 F.2d 355 (8th Cir. 1967), one of two defendants charged with robbing a postal station was arrested near the end of March. Four times in April he was interro-

He believes that the Court so decided nascently in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the seminal case itself. *Michigan v. Tucker*, 417 U.S. 433, 459 n. 5, 94 S.Ct. 2357, 2372 n. 5, 41 L.Ed.2d 182, 202 n. 5 (1974) (Brennan, J., concurring). On the other hand, Mr. Justice White believes that the Court not only has not so decided, but never should. *Id.* at 461, 94 S.Ct. at 2372, 41 L.Ed.2d at 203 (White, J., concurring).

gated by local police, who did not advise the defendant of his Fifth Amendment right to remain silent. The last interrogation produced the defendant's confession of his involvement in the crime. Three days later federal authorities questioned the defendant. They fully advised the defendant of his Fifth and Sixth Amendment rights. The federal officers were aware of the defendant's earlier confession to local authorities. The defendant made more admissions to the federal officers. The Court of Appeals ruled that, as a matter of law, the admissions made by the defendant to the federal officers were the causally tainted fruit of the defendant's confession to the local authorities. *Id.* at 360, 361. The federal authorities had been the beneficiaries of the unlawful, coercive interrogation by the local police. *Id.* at 361. Hence, the Court reversed the defendant's conviction. *Id.*

Similarly, the Fifth Circuit has used the tainted fruit of the poisonous tree doctrine to exclude subsequent incriminating statements. In *Harney v. United States*, 407 F.2d 586 (5th Cir. 1969), the defendant was arrested by local police. They obtained oral and written confessions from him without informing him of his Fifth and Sixth Amendment rights. Later that day the defendant was interrogated by an F.B.I. agent. After the agent advised him of his rights, the defendant made a written confession in his own handwriting. The Fifth Circuit reversed the conviction, finding that a causal relationship existed

". . . between on the one hand the earlier unconstitutional conduct (and the statement which is a product thereof . . .) and on the other hand the statement made later." *Id.* at 589.

The confession obtained by the F.B.I. agent was an additional tainted fruit of the coercive activity of the local police, *Id.* at 589–90; and the causal effect of that activity, together with the confessions induced, prevented the taint from being dissipated. *Id.* at 590.

*Gilpin v. United States*, 415 F.2d 638 (5th Cir. 1969), illustrates the difference between voluntary and involuntary statements, and their relationship to a defendant's later, indirect statements. The defendant, arrested by local police for public intoxication, was taken to the city jail. During processing, he spontaneously confessed to stealing a United States mail bag. The next morning, while still under the effects of intoxication, the defendant, who had only a sixth grade education, was formally interrogated without an adequate warning of his Fifth and Sixth Amendment rights. The defendant repeated his earlier confession, but with some confusion in details. Later that day, and again four days later, federal postal inspectors questioned the defendant after fully advising him of his rights. Again the defendant repeated his confession, clarifying the earlier confusion. The Fifth Circuit found a close casual connection between the confession given in response to questioning, but without adequate warnings, and the later, clarified confession to postal inspectors, after adequate admonition. "One confession led to another. The effect of the tainted confession was not dissipated by the time of the next confession." *Id.* at 642.

These three cases illustrate that, where there is unlawful, coercive interrogation by a group of law enforcement officers, resulting in confessions or admissions by a defendant, and where lawful interrogation by different authorities follow, producing additional incriminating statements by the defendant, despite the second, lawful interrogation, the later admissions or confessions are infected by the same taint that pervades the earlier, illegally elicited statements. In those cases where courts have admitted a defendant's incriminating statements made after earlier, involuntary confessions, the courts have found that the second exception to the tainted fruit of the poisonous tree doctrine applied: any indirect causal connection had become so attenuated that the taint was dissipated, or no causal relationship ever existed. *Tanner v. Vincent*, 541 F.2d 932, 937 n. 5 (2d Cir. 1976); *United States v. Toral*, 536 F.2d 893, 897 (9th Cir. 1976); *Samora v. United*

*States*, 406 F.2d 1095, 1099 (5th Cir. 1969); *United States v. Knight*, 395 F.2d 971, 975 (2d Cir. 1968). Nonetheless, it was only after employing the tainted fruit of the poisonous tree doctrine, and its exceptions, that those courts determined the later incriminating statements to be truly voluntary and properly admissible.

### 2. *Indirect Testimonial Evidence: Third Persons'*.

In discussing the purpose of the exclusionary doctrine, in *Michigan v. Tucker, supra*, the Supreme Court stated: "In a proper case this rationale would seem applicable to the Fifth Amendment context as well." 417 U.S. at 447, 94 S.Ct. at 2365, 41 L.Ed.2d at 194. However, apart from *Harrison v. United States, supra*, in which the Supreme Court applied the exclusionary doctrine to a defendant's own indirect, testimonial evidence, the Court has not applied that doctrine to either indirect, testimonial evidence of third persons or to indirect, nontestimonial evidence.

In *Parker v. Estelle*, 498 F.2d 625 (5th Cir. 1974), *cert. den.* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975), the Fifth Circuit was presented the question, albeit in a habeas corpus petition,[7] whether the exclusionary doctrine should apply to the indirect testimonial evidence of a witness, where the defendant's involuntary confession had been suppressed. The defendant had confessed to murdering his father. Prior to the confession, the family gardener had stated that he saw and heard nothing suspicious at the time of the homicide. Later, after being informed of the defendant's confession, the gardener changed his testimony to inculpate the defendant. At trial, the government relied exclusively on the gardener's altered testimony, and the defendant was convicted. On appeal the Fifth Circuit declared,

> "There can be no doubt that the *Silverthorne* principle, announced in a search and seizure context, is applicable to a suppressed confession case, *Harrison v. United States*, . . . ; or that its exclusionary effect applies not only to tangible evidence but also to the testimony of witnesses." *Id.* at 629.

The Court employed both the actual use test, and the two exceptions, of the tainted fruit of the poisonous tree analysis. *Id.*; *United States v. Houltin*, 525 F.2d at 949–50. The Court found that the two exceptions had been established together. 498 F.2d at 630. Although the change in the gardener's testimony occurred after he became aware of the defendant's confession, it also occurred after he was advised by his lawyer to tell the truth. Because it could not speculate concerning which motive might have directly prompted the changed testimony, or whether the latter motive provided the independent source for it, the Court of Appeals held that whatever causal connection that might have existed between the defendant's involuntary confession and the gardener's revised testimony was "so attenuated as to dissipate the taint." *Id.*

The Second Circuit similarly used the tainted fruit of the poisonous tree analysis in *United States v. Nagelberg*, 434 F.2d 585 (2d Cir. 1970). The defendant's prior, in-

---

**7.** The Supreme Court, in *Stone v. Powell*, 428 U.S. 465, 494, and n. 37, 96 S.Ct. 3037, 3052 and n. 37, 49 L.Ed.2d 1067, 1088 and n. 37 (1976), held that exclusionary doctrine issues are not grounds for a federal court's collateral review and relief in habeas corpus petitions, where the questions of Fourth Amendment violations were considered and decided unfavorably to the petitioner in the state court proceedings. Since the application of the tainted fruit of the poisonous tree doctrine, in the Fifth and Sixth Amendments contexts, is premised on the same kind of enforcement for those constitutional guarantees as for the Fourth Amendment, collateral consideration about the exclusion of indirect evidence from alleged violations of the Fifth and Sixth Amendments arguably might be precluded as well, where already decided adversely in state court proceedings. *Cf. Stone v. Powell*, 428 U.S. at 471–74 and n. 4, 96 S.Ct. at 3042 and n. 4, 49 L.Ed.2d at 1074–75 and n. 4, *rev'g Rice v. Wolff*, 513 F.2d 1280 (8th Cir. 1975), *aff'g* 388 F.Supp. 185 (D.Neb.1974) (Habeas corpus petition). Of course, issues about the exclusion of direct evidence obtained from Fifth and Sixth Amendment violations would still be reviewable collaterally on the independent, due process considerations that accompany the Fifth and Sixth Amendment guarantees.

criminating statement, in Canada, had been suppressed. A government rebuttal witness, who had been named in the defendant's suppressed statement, inculpated the defendant in previous criminal activity. The Second Circuit held that the first exception had been demonstrated, since "there existed a number of independent sources of information," including the defendant's own testimony at trial, that supplied the rebuttal witness' identity. The voluntariness of the defendant's own testimony at trial, which furnished a lead to the rebuttal witness, removed "any taint that may have existed." *Id.* at 587.

### 3. *Indirect Nontestimonial Evidence.*

In *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), the Supreme Court was presented an opportunity to apply the tainted fruit of the poisonous tree doctrine to indirect, nontestimonial evidence. The Court, however, did not do so. *Michigan v. Tucker*, 417 U.S. at 460–61, 94 S.Ct. at 2372–73, 41 L.Ed.2d at 202–03 (White, J., concurring); *United States v. Castellana*, 500 F.2d 325, 327 n. 7 (5th Cir. 1974) (en banc), *aff'g in part & rev'g in part* 488 F.2d 65 (5th Cir. 1974). In *Orozco v. Texas, supra,* the defendant had shot the victim during a fight outside a restaurant, and then retreated to his room at a boarding house. He was in bed, sleeping, when police entered about four hours later. It was not the police entry into the room that the Supreme Court deplored, but the coercive interrogation of the defendant while in custodial-like restraint, without the precautionary warnings of his Fifth and Sixth Amendment rights. The defendant made several admissions including ownership of a gun and its location. Later ballistics tests confirmed that the gun was the weapon that "fired the fatal shot." *Id.*, 394 U.S. at 325, 89 S.Ct. at 1096, 22 L.Ed.2d at 314. The high court reversed the defendant's conviction, holding that

> ". . . the use of these admissions obtained in the absence of the required warnings was a flat violation of the Self- Incrimination Clause of the Fifth Amendment . . ." *Id.* at 326, 89 S.Ct. at 1096, 22 L.Ed.2d at 314.

The Court, however, said nothing about the admissibility of the ballistics test and weapon in the event of retrial.

The Court of Appeals, in *Parker v. Estelle*, 498 F.2d 625, 629 (5th Cir. 1974), expressed certainty that the tainted fruit of the poisonous tree doctrine applies, in the Fifth Amendment context, "not only to tangible evidence but also to the testimony of witnesses." One year later, however, the Court seemed to express indecision. *Null v. Wainwright*, 508 F.2d 340 (5th Cir. 1975), was a habeas corpus petition by a petitioner convicted in the Florida courts of raping a six-year old. The incriminating statements by the petitioner-defendant violated the Fifth Amendment and should have been suppressed. *Id.* Nevertheless, the Court would only "assume, without deciding, that the fruits of statements secured without *Miranda's* preventive measures are generally inadmissible." *Id.* at 342. The Fifth Circuit's indecision is attributable to (1) the absence of any genuine violation of the Fifth or Sixth Amendments in *Michigan v. Tucker, supra,* which the Court of Appeals expressly followed, *Null v. Wainwright*, 508 F.2d at 342 and n. 4, and 343; as well as (2) the harmlessness of erroneously admitting the physical evidence (petitioner's clothes and bed linens), "in view of the overwhelming evidence of rape." *Id.* at 343–44; *cf. Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705, 709–11 (1967).

The Fifth Circuit's lack of doubt in *Parker v. Estelle, supra,* and later lack of decision in *Null v. Wainwright, supra,* can therefore be consistently harmonized. On the one hand, where, as the Supreme Court found in *Harrison v. United States, supra,* there is a genuine violation of the Fifth Amendment, the exclusionary doctrine should apply to the tainted fruit of both testimonial and tangible evidence. *Parker v. Estelle*, 498 F.2d at 629. On the other hand, where, as the Supreme Court determined in *Michigan v. Tucker, supra,* even though there is a defect in the *Miranda*

safeguards, there is no violation of the Fifth or Sixth Amendments, application of the tainted fruit of the poisonous tree doctrine may be unwarranted and unnecessary. *Null v. Wainwright*, 508 F.2d at 342 n. 4 and 343. *See United States ex rel. Hudson v. Cannon*, 529 F.2d 890, 892–95 (7th Cir. 1976).

### D. Sixth Amendment, the Exclusionary Rule, and the "Tainted Fruit of the Poisonous Tree" Doctrine.

█ If there were ever any doubt before [8] *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Supreme Court emphatically held in that decision that direct testimonial evidence, obtained by violating an accused's Sixth Amendment right to counsel, must be excluded from trial. *Id.* at 406 n. 12, 97 S.Ct. at 1243 n. 12, 51 L.Ed.2d at 441 n. 12. The Court expressly refrained from deciding, however, whether any of the indirect evidence should be excluded as "tainted fruit" from the poisonous tree of the Sixth Amendment violation. *Id.* Moreover, when the Supreme Court had declined to consider the question of tainted indirect evidence, in *Michigan v. Tucker, supra*, it did so in the context of defective *Miranda* warnings. Not only was there no Fifth Amendment violation, there was no denial of the Sixth Amendment right to counsel either. 417 U.S. at 438, 94 S.Ct. at 2360, 41 L.Ed.2d at 189.

The most enlightening recent decision on the issue of a Sixth Amendment violation and tainted indirect evidence is *United States ex rel. Hudson v. Cannon*, 529 F.2d 890 (7th Cir. 1976), a state habeas corpus petition. The petitioner was taken first to the scene of the crime, and then to a police station where he was questioned briefly. Thereafter, he was taken to a second police station where he was interrogated for 5½ hours, not warned of his Fifth and Sixth Amendment rights, and not permitted to call a lawyer. During the lengthy, second interrogation, the defendant implicated an accomplice, who in turn later implicated a second accomplice. Both accomplices testified against the defendant at trial. Unlike *Michigan v. Tucker, supra*, law enforcement officers were required to give the *Miranda* warnings at the time the defendant-petitioner was arrested. 529 F.2d at 891.

The specific question presented by the habeas corpus petition was whether the indirect, third-person testimonial evidence of the accomplices could be the tainted fruit of a constitutional violation. If so, the petitioner raised claims that were both cognizable and remediable under a federal court's habeas corpus jurisdiction; and he should have been allowed an opportunity to prove his claims. If not, then denial of the petition, and dismissal of the case without a hearing was proper. The Seventh Circuit followed the Supreme Court's reasoning in *Michigan v. Tucker, supra*, that (1) the *Miranda* warnings are not constitutional guarantees, but procedural safeguards to enforce constitutional rights; and (2) the failure to apprise a defendant of the *Miranda* warnings should not result in the exclusion of direct testimonial evidence where the admissions were voluntarily made, without any infringement of Fifth and Sixth Amendment rights. 529 F.2d at 892, 895. Hence, the Seventh Circuit held that exclusion of indirect, third-person testimony as "tainted fruit" was unwarranted under such circumstances. *Id.* at 895. Where, however, there was a likelihood that violations of Fifth or Sixth Amendment rights, or both, had occurred (as the petitioner had alleged), such charges raised issues deserving consideration. If they should be proven, then the Seventh Circuit would apply the tainted fruit of the poisonous tree doctrine to the indirect, third-person testimony. *Id.* at 893. Moreover, the state (which had not argued the issue of genuine violation of constitutional rights) would have the burden of demonstrating that the accomplices' testimony qualified as one of the two purgative exceptions. *Id.* at 895.

---

8. *See, e. g., Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Spano v. New York*, 360 U.S. 315, 325–26, 79 S.Ct. 1202,

1208–09, 3 L.Ed.2d 1265, 1273–74 (Douglas & Stewart, JJ., concurring).

III. *Conclusion.*

■ In the present case, the Fifth Circuit has ruled that Massey's Fifth Amendment right against self-incrimination, and Sixth Amendment right to counsel were violated while he was in custody. *United States v. Massey*, 550 F.2d at 307–08. Despite his repeated refusals to discuss the alleged assassination plot, and his repeated requests to consult a lawyer first, the F.B.I. agents continued to interrogate Massey. He made his incriminating admissions to an F.B.I. agent only after misleading and deceptive assurances that the information sought was unrelated to the purported plot. All of this occurred in the absence of counsel and in disregard of Massey's desire to confer with a lawyer.

This case is the inverse of the situation in *Michigan v. Tucker, supra.* Although adequate *Miranda* warnings were given perfunctorily, Massey's constitutional rights, which those warnings were intended to protect, were actually infringed. This case is the extension beyond *Michigan v. Mosley, supra,* to the unlawful situation described in that decision. 423 U.S. 96, 101 n. 7, 102–04 and n. 10, 105–06, 96 S.Ct. 321, 325 n. 7, 325–26 and n. 10, 327, 46 L.Ed.2d 313, 320 n. 7, 321 and n. 10, 322, and 423 U.S. at 109–10 and n. 2, 96 S.Ct. at 329 and n. 2, 46 L.Ed.2d at 325 and n. 2. (White, J., concurring). In *Michigan v. Mosley*, the defendant at first declined to answer any questions when interrogated shortly after his arrest. Approximately two hours later he was taken to another floor and questioned by other officers about a different offense. The defendant confessed to the second offense. The Supreme Court found no unlawful coercion. Although there was successive interrogation, there was no assertion of the right to counsel and no failure to scrupulously observe it. In the present case, Massey asserted both his desire to remain silent and his wish to consult with a lawyer. Neither of those rights were honored by the F.B.I. agents.

Because of the infringement of those constitutional rights, the Fifth Circuit ruled that the direct evidence, Massey's own admissions, must be excluded. *United States v. Massey*, 550 F.2d at 308. The Seventh Circuit held, in *United States ex rel. Hudson v. Cannon*, 529 F.2d at 892, that if the petitioner could establish genuine violations of the Fifth or Sixth Amendments, the tainted fruit of the poisonous tree doctrine would apply to the indirect testimonial evidence of the accomplices. The two purgative exceptions to that doctrine would also be available for the state to demonstrate. *Id.* at 895.

■ This Court must now decide whether to follow the Seventh Circuit and apply the tainted fruit of the poisonous tree doctrine to the indirect testimonial and nontestimonial evidence derived from Massey's involuntary admissions. The violation of Massey's Fifth and Sixth Amendment rights by the F.B.I. agent was not only genuine, it was flagrant and egregious. The Court therefore holds that the tainted fruit of the poisonous tree doctrine should, and does, apply: all indirect evidence, testimonial and tangible, acquired from Massey's admissions must be excluded as the tainted fruit of the disregard of his Fifth and Sixth Amendment rights. The burden of proof is on the government to show that any of the indirect evidence which it might wish to use qualifies under one of the two cathartic exceptions: (1) obtained from an independent source, or (2) the causal effect is so attenuated that the resultant taint has been dispelled.

■ The government concedes that the testimony of James Staudacher was obtained solely from the information in Massey's unlawfully elicited admissions. It is tainted and must be excluded.

■ When Massey met with the F.B.I. agent at the Oklawaha Bridge, on the morning of September 25, 1975, he was not in custody or under any form of restraint. At that time, he revealed his name, the gas station where he had worked, and the name and address of his mother, in Georgia. That information, obtained voluntarily and prior to any form of custody, is free from the taint of later illegal conduct by the

F.B.I. because it was derived from an independent source. From the location of Massey's employment, the F.B.I. contacted his employer and the employer's wife, who provided testimony at trial concerning Massey's travels in Mississippi and Alabama during August, 1975. From the name and address of Massey's mother, the F.B.I. interviewed her in Royston, Georgia. She provided the name of one of Massey's friends who testified at trial concerning Massey's whereabouts during part of July, 1975. He in turn furnished the name of another of Massey's friends. That friend also testified briefly at trial about Massey's presence in Georgia during part of the 1975 summer. Massey's brother-in-law, who was discovered through information obtained from Massey's mother and employer, also testified briefly. Finally, one of Massey's former co-workers at the gas station testified that Massey told him about a plot to assassinate President Ford and Senator Kennedy.

It is clear to the Court that this third-person testimonial evidence was obtained from sources independent of Massey's own involuntary admissions. Hence, it is purged of the taint that would require its exclusion if it had been gained only indirectly from the coerced admissions. The Court holds that the testimony of these third persons need not be excluded as tainted by the illegal conduct of the F.B.I. agent when Massey was in custody.

Similarly, the nontestimonial, physical evidence acquired from the inventory search of Massey's van should not be excluded. Such inventory searches of motor vehicles, where the vehicle remains intact and is not dismantled, are justified in order to protect the accused's property, to protect the law enforcement officers from liability for that property, and to protect the law enforcement authorities from potential danger. *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000, 1005 (1976); *United States v. Edwards*, 554 F.2d 1331, 1337 (5th Cir. 1977); *United States v. Jamerson*, 549 F.2d 1263, 1271 (9th Cir. 1977); *United States v. Ed-*

*mond*, 548 F.2d 1256, 1259 (6th Cir. 1977); *United States v. Friesen*, 545 F.2d 672, 673 (9th Cir. 1976); *United States v. Morrow*, 541 F.2d 1229, 1232 (7th Cir. 1976). Consequently, the tangible items of evidence acquired from Massey's van are admissible as well as any indirect testimonial and nontestimonial evidence derived from them.